STATE OF NEW YORK
SUPREME COURT          COUNTY OF ONONDAGA

NIAGARA MOHAWK POWER CORPORATION
300 Erie Boulevard West
Syracuse, New York 13202,

                              *Plaintiff,*                    **SUMMONS**

                                                   Index No. _____

          -vs-

WINDSTREAM COMMUNICATIONS, LLC, f/k/a
WINDSTREAM COMMUNICATIONS, INC.
4001 Rodney Parham Road
Little Rock, Arkansas 72212,

                              *Defendant.*

**TO THE ABOVE-NAMED DEFENDANT:**

          **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorneys an

Answer to the Complaint in this action within twenty (20) days after service of this Summons,

exclusive of the day of service, or within thirty (30) days after service is complete if this

Summons is not personally delivered to you within the State of New York.  In case of your

failure to answer, Judgment will be taken against you by default for the relief demanded in the

Complaint.

          The basis of venue in this action is the residence and principal office of Plaintiff, pursuant

to Civil Practice Law and Rules ("CPLR") Section 503(c).

10736694.6

**DATED:** November 6, 2015
Syracuse, New York

**BARCLAY DAMON, LLP**

By: _____
Jon P. Devendorf
John M. Nichols

*Attorneys for Plaintiff*
*Niagara Mohawk Power Corporation*
One Park Place
300 South State Street
Syracuse, New York 13202
Telephone (315) 425-2770

STATE OF NEW YORK
SUPREME COURT      COUNTY OF ONONDAGA

---

**NIAGARA MOHAWK POWER CORPORATION,**

<em>Plaintiff,</em>

**COMPLAINT**

-vs-

Index No. _____

**WINDSTREAM COMMUNICATIONS, LLC f/k/a
WINDSTREAM COMMUNICATIONS, INC.,**

<em>Defendant.</em>

---

Plaintiff Niagara Mohawk Power Corporation ("Niagara Mohawk" or the "Company"), by its attorneys, Barclay Damon, LLP, as and for its Complaint against Defendant Windstream Communications, LLC, formerly known as Windstream Communications, Inc. ("Windstream" or "Defendant"), hereby alleges that:

<strong><u>NATURE OF ACTION</u></strong>

1.     This is an action for money damages arising from Windstream's breach of contract and failure to pay Niagara Mohawk for costs it incurred to protect Windstream's fiber-optic cables as part of a transmission rebuild project. Despite its knowledge of and request that Niagara Mohawk undertake the protective work on its behalf, Windstream thereafter refused to pay for the work as required by the parties' contract. Through its wrongful acts and omissions, Windstream has damaged Niagara Mohawk in the amount of $9,411,159.42 for the invoiced costs, as well as late fees as provided by agreement, and is further accountable to Niagara Mohawk for interest and the legal fees, costs and expenses of this action.

## PARTIES

2.      At all times relevant hereto, Niagara Mohawk was and is a corporation organized and existing under the laws of the State of New York, with a principal business office located at 300 Erie Boulevard West, Syracuse, New York 13202, in Onondaga County.

3.      Upon information and belief, Defendant Windstream is a foreign limited liability company organized and existing under the laws of the State of Delaware, with a principal business office located at 4001 Rodney Parham Road, Little Rock, Arkansas 72212, and is the successor to Windstream Communications, Inc.

## VENUE AND JURISDICTION

4.      The Court has jurisdiction over the subject matter of this action pursuant to Judiciary Law Section 140-b.

5.      The Court has personal jurisdiction over Defendant pursuant to CPLR Section 302 because Defendant transacts business within the state and contracts to provide services within the state.

6.      This action is properly venued in this Court pursuant to CPLR Section 503(c).

## FACTUAL BACKGROUND

### Niagara Mohawk.

7.      Niagara Mohawk provides electricity and natural gas to more than 2 million people throughout upstate New York.

8.      Niagara Mohawk provides its electric services through a network of overhead and underground transmission and distribution lines across upstate New York.

9.      Certain of Niagara Mohawk's transmission and distribution lines are situated on real property to which the Company holds a right-of-way or other possessory or ownership interest.

10.     In the case of underground facilities, Niagara Mohawk at times enters into third-party agreements to allow other utilities and telecommunications providers to occupy space for their facilities in the underground trench.

11.     From time to time, Niagara Mohawk's electric transmission and distribution facilities are maintained, updated and otherwise rebuilt to suit Company and customer service needs.

**The Agreement.**

12.     On or about April 10, 2002, Niagara Mohawk and Dominion Telecom, Inc. ("Dominion") entered into a certain "Right of Occupancy Agreement Authorizing Use of Certain Niagara Mohawk Rights-of-Way", and an addendum thereto known as the "Addendum to Niagara Mohawk Right of Occupancy Agreement in Connection with the Sale of Telergy Assets" (together, the "Agreement"). A true and accurate copy of the Agreement is annexed hereto as Exhibit A.

13.     Upon information and belief, Windstream, through various acquisitions, succeeded to the rights and obligations of Dominion under the Agreement.

14.     Upon information and belief, Windstream provides telecommunications services to customers by way of networks of fiber-optic cables ("Cables"), some of which are located in upstate New York.

15.     In return for compliance with certain financial and other obligations, the Agreement confers a right on Windstream to occupy and use certain real property in which Niagara Mohawk has possessory rights and holds underground facilities.

16.     Pursuant to the Agreement, Windstream owns and operates underground Cables at various locations which are located beneath the surface of land that is owned, used, or possessed by Niagara Mohawk.

17.     Among other rights and obligations, the Agreement expressly addresses the costs associated with the maintenance of the property and the protection of underground facilities.

18.     Under Section 8(a) of the Agreement, Windstream bears the obligation to pay for any activities which are undertaken pursuant to 16 NYCRR Part 753 for the protection of underground facilities.

19.     Under Section 8(c) of the Agreement, Windstream is also responsible for any incremental increases in the costs of maintenance services undertaken by Niagara Mohawk to the real property, or for right-of-way maintenance that is provided for the sole benefit of Windstream.

20.     In the same manner, Section 20(a) of the Agreement requires Windstream to pay Niagara Mohawk for work performed at the request, benefit or obligation of Windstream.

21.     Windstream is also required under Sections 8(c) and 20(a) of the Agreement to reimburse Niagara Mohawk for such costs incurred for its protection and benefit within thirty (30) days of invoicing, and further entitles Niagara Mohawk to recover its actual costs, plus ten percent (10%), in the event the Company uses outside contractors or consultants in performing such work.

22.     As a result of Windstream's breach, it is required by law and agreement to pay late fees, interest, costs, and reasonable attorneys' fees to Niagara Mohawk. (*See* Agreement §§ 8(c), 20(a), 37(b).)

**Lockport-Mortimer #111 Rebuild Project.**

23.     In or around May 2011, Niagara Mohawk provided notice that it would perform Right-of-Way Maintenance to a fifty-six (56) mile segment of the Company's transmission network between Lockport, New York, and Mortimer, New York (the "Lockport-Mortimer #111 Rebuild Project" or the "Project").

24.     On December 23, 2011, Windstream acknowledged awareness of the Project in a letter from Richard Hammetter, Defendant's Director of Outside Plant Network ("December Letter"). A true and accurate copy of the December Letter is annexed hereto as Exhibit B.

25.     Upon information and belief, by that time, Windstream had acquired the Agreement and the rights and obligations formerly held by Dominion.

26.     In the December Letter, Windstream demanded, among other things, that Niagara Mohawk "utilize appropriate ground protection (i.e. matting, plates, etc.)" over areas wherein Defendant's Cables would be crossed with heavy trucks or equipment (the "Protective Matting").

27.     From January 2012 to February 2012, Niagara Mohawk provided Protective Matting as demanded by Windstream in connection with the Project.

28.     The sole purpose for the Protective Matting was to protect Windstream's Cables, and the sole benefit of such efforts was to Windstream.

29.     On or about March 9, 2012, Niagara Mohawk contacted Director Hammetter, and asked for additional direction as to where the Protective Matting should be placed with respect to Windstream's Cables ("March Letter") and expressly reserved its contractual right to reimbursement for the incremental increase in costs Plaintiff incurred in utilizing the Protective Matting. A true and accurate copy of the March Letter is annexed hereto as Exhibit C.

30.     Following a meeting of representatives, on or about April 9, 2012, Niagara Mohawk provided Windstream with an estimate of the contractor's costs to complete the Protective Matting for the remainder of the Project ("April Letter"). A true and accurate copy of the April Letter is annexed hereto as Exhibit D.

31.     The April Letter again stated that Niagara Mohawk would require reimbursement of all incremental increases in cost incurred to protect Windstream's Cables, which costs were then estimated to be $6.9 million (which included approximately $1.47 million in costs then accrued).

32.     From April 2012 through November 2012, Niagara Mohawk continued installing Protective Matting for the benefit of Windstream.

33.     On or about May 7, 2012, Niagara Mohawk sent Windstream Invoice number 00036-084435 in the amount of $1,927,179.69 ("May Invoice") for the Protective Matting used between January and February 2012.  A true and accurate copy of the May Invoice is annexed hereto as Exhibit E.

34.     In response, on or about May 9, 2012, Windstream notified Niagara Mohawk that it was referring the matter to legal counsel. A true and correct copy of Defendant's May Email is annexed hereto as Exhibit F.

35.     Despite having requested the Protective Matting and knowing that such work would be performed at its expense, on June 27, 2012, Windstream advised Niagara Mohawk that it "disputed" the May Invoice. True and accurate copies of the June 27th Email, and of the June 27th Letter are annexed hereto as Exhibit G and Exhibit H.

36.     At no time prior to June 2012 did Windstream dispute its responsibilities for the cost of such work and it never rescinded its request that the work be performed by Niagara Mohawk.

37.     So as not to delay the already in-progress Project along a fifty-six (56) mile electric facilities corridor, Niagara Mohawk continued and completed the Protective Matting Services for Windstream in or around November 2012.

38.     Subsequently, Niagara Mohawk issued Windstream a revised Invoice in the amount of $1,685,418.40, for the Protective Matting used between January and February 2012 ("Revised

May 2012 Invoice") and Invoice number 800045728 in the amount of $7,725,781.02 for the Protective Matting Services performed between April 2012 and November 2012 ("January 2014 Invoice"). True and accurate copies of the Revised May 2012 Invoice and the January 2014 Invoice are annexed hereto as Exhibit I and Exhibit J.

39.     No objection has been made concerning the installation of the Protective Matting over Windstream's Cables or the cost of the Protective Matting as reflected in the invoices.

40.     Despite due demand, Windstream has wrongfully failed to pay Niagara Mohawk as required by the Agreement for the services undertaken at its request and for its benefit.

## AS AND FOR A FIRST CAUSE OF ACTION
(Breach of Contract)

41.     Plaintiff repeats and realleges each of the allegations set forth above as if set forth in full.

42.     As set forth herein, Niagara Mohawk and Windstream are the interested parties to the Agreement which addresses responsibility for, among other things, costs such as those incurred for the Protective Matting.

43.     As set forth herein, Niagara Mohawk utilized such Protective Matting at the direction of and to benefit Windstream which agreed to bear the cost of expenses associated with protecting underground facilities.

44.     As set forth herein, Niagara Mohawk has at all times performed the Agreement.

45.     As set forth herein, Windstream has breached the Agreement by failing and refusing to pay the Invoices issued by Niagara Mohawk within thirty (30) days as required by the Agreement.

46.     As set forth herein, Niagara Mohawk has been damaged by the wrongful acts and omissions of Windstream.

47. As a result of the forgoing, Niagara Mohawk is entitled to damages in an amount no less than $9,411,159.42 along with late fees, interest and the legal fees and expenses of this action.

## AS AND FOR A SECOND CAUSE OF ACTION
(Unjust Enrichment)

48. Niagara Mohawk repeats and realleges each of the allegations set forth above as if set forth in full.

49. As set forth herein, the Protective Matting was installed for the sole benefit of Windstream.

50. As set forth herein, Windstream has been enriched by Niagara Mohawk's performance of the Protective Matting Services.

51. As set forth herein, such enrichment was at Niagara Mohawk's expense and is therefore unjust and inequitable.

52. As a result of the forgoing, Niagara Mohawk is entitled to damages in an amount no less than $9,411,159.42 along with late fees, interest and the legal fees and expenses of this action.

## AS AND FOR A THIRD CAUSE OF ACTION
(*Quantum Meruit*)

53. Niagara Mohawk repeats and realleges each of the allegations set forth above as if set forth in full.

54. As set forth herein, Niagara Mohawk utilized the Protective Matting Services in good faith and upon the demand of Windstream.

55. As set forth herein, Windstream was aware of the Protective Matting and accepted the benefit thereof.

56. As set forth herein, Niagara Mohawk expected to be compensated for the costs of the Protective Matting that was provided to Windstream.

57.     As set forth herein, the just and reasonable value of the Protective Matting is an amount capable of determination.

58.     As a result of the forgoing, Niagara Mohawk is entitled to damages in an amount no less than $9,411,159.42 along with late fees, interest and the legal fees and expenses of this action.

## JURY DEMAND

Niagara Mohawk demands a trial by jury on all issues so triable.

**WHEREFORE**, Niagara Mohawk demands Judgment as follows:

1.     On the cause of action for breach of contract, awarding damages no less than $9,411,159.42 along with late fees, interest and the legal fees and expenses of this action.;

2.     On the cause of action for unjust enrichment, awarding damages no less than $9,411,159.42 along with late fees, interest and the legal fees and expenses of this action;

3.     On the cause of action for *quantum meruit*, awarding damages no less than $9,411,159.42 along with late fees, interest and the legal fees and expenses of this action; and

4.     Awarding Niagara Mohawk such other and further relief as the Court deems just and proper.

**DATED:** November 6, 2015

**BARCLAY DAMON, LLP**

By: _____

Jon P. Devendorf
John M. Nichols

*Attorneys for Plaintiff*
*Niagara Mohawk Power Corporation*
One Park Place
300 South State Street
Syracuse, New York 13202
Telephone (315) 425-2770

**<u>FAX SERVICE NOT ACCEPTED</u>**

# EXHIBIT A

4/9/02

From: Joe Snyder

To:      Recipient                  Agreement sent

          J. Euto                    All
          T. Mitchell                Pole Attachment
          D. Bush                    Right of Occupancy w/Addendum
          M. Agle                    Right of Occupancy w/Addendum
          F. Sciortino               Right of Occupancy w/Addendum
          D. Dow                     Right of Occupancy w/Addendum
          R. Daggett                 All

Enclosed is a copy of the Agreement(s) signed with Dominion Telecom.  Continued use the Telergy assets, and all future use by Dominion of NMPC facilities/ROW, is governed by these new agreements.

All existing Telergy agreements have been voided.  Any questions, please call me at x6747

## ADDENDUM TO NIAGARA MOHAWK RIGHT OF OCCUPANCY
## AGREEMENT IN CONNECTION WITH THE SALE OF TELERGY ASSETS

### 1.0    DEFINITIONS

Capitalized terms shall have the meaning defined herein, or if not defined herein, then the meaning defined in the Right of Occupancy Agreement, hereinafter referred to as "the Agreement."

**Affiliate** – shall mean an entity owned or controlled by Niagara Mohawk, or any successor to Niagara Mohawk by purchase, merger, consolidation or reorganization, or an affiliate entity that has the power to direct or cause the direction of management and policies of Niagara Mohawk, or to an affiliate entity with which Niagara Mohawk, or the controlling owners of Niagara Mohawk, have the power to direct or cause the direction of management and policies of such affiliate entity.

**Backbone Route** - shall mean the geographic location of the Licensee's System, which shall connect Points of Presence as defined below.

**Building Entrance Links** – Duct, conduit, innerduct, pipes, manholes, handholes, and other facilities necessary to enter and access Licensee Facilities and third-party collocation and regeneration facilities.

**Duct** - shall mean either Duct owned by Licensee or Duct owned by Niagara Mohawk which could include an individual pipe or tube installed and owned by Licensee forming an enclosed raceway for cable installed in Niagara Mohawk Rights-of-Way.
It could also include duct on Niagara Mohawk's conduit system and any innerduct installed or existing in Niagara Mohawk's conduit system, whether installed by Niagara Mohawk or another entity, are owned by Niagara Mohawk.

**Licensee Facilities** – Without limiting the definition of Licensee Facilities contained in the Agreement, the parties expressly agree and understand that Licensee is assuming and receiving all of Telergy's assets conveyed to Licensee by the Chapter 7 Trustee for Telergy, Inc., et al.

**Niagara Capacity** – except as otherwise stated herein, shall mean the equivalent capacity of five (5) OC-3's as set forth below in Article 5.0, which Niagara Capacity shall be, for the term of the Agreement, continuously provided to Niagara Mohawk by Licensee in consideration of Licensee's use of the Right of Way.

**Niagara Strands** - shall consist of pairs of individual fiber optic strands in Licensee's fiber optic cable that are indefeasibly owned by Niagara Mohawk.  Pairs of Niagara Strands shall be located in separate buffer tubes in sequential order and shall be

continuous and of the same type and quality as all other strands within the contiguous System.

**Points of Presence** (POP) – shall mean the following points at Niagara Mohawk locations where the Niagara Capacity will be delivered and interconnect with the Licensee's System:

**Buffalo**
> 144 Kensington Ave., Buffalo, NY

**Batavia**
> 5100 E. Main St, Batavia

**Syracuse**
> 300 Erie Blvd West, Syracuse
> Central Regional Control, 7437 Henry Clay Blvd., Liverpool, NY

**Oswego**
> Lake Rd, Nine Mile Point

**Watertown**
> 21265 NT State Route 232 (Rices Rd)

**Utica**
> 221 Old Campion Rd, New Hartford

**Albany**
> 5215 Western Turnpike, Altamont (ERCC in Guilderland)
> 1125 Broadway, Albany, NY

**Glens Falls**
> 636 Quaker Rd., Glens Falls

**Right of Occupancy Agreement** – shall mean the Agreement entered into by and between Niagara Mohawk and Licensee contemporaneous with this Addendum.

## 2.0    SCOPE OF THIS ADDENDUM

2.1    Notwithstanding applicable provisions in the Agreement to the contrary, the compensation Licensee shall pay to Niagara Mohawk for any use and occupancy of Niagara Mohawk Rights-of-Way existing on or before the effective date of this Agreement, shall be governed by the terms of this Addendum.

2.2    Subsequent to the execution of the Agreement, Niagara Mohawk shall be compensated in accordance with the Agreement and not by reference to this Addendum for any expanded or additional use of Niagara Mohawk Rights-of-Way, including without limitation, installation and occupancy of additional Duct, and use or occupancy of existing Duct or Rights-of-Way not presently occupied by Licensee.

2.3    In addition to any other compensation payable to Niagara Mohawk for use and occupancy of the Niagara Mohawk Rights-of-Way, Licensee shall pay to Niagara Mohawk a one-time payment of seven-hundred eighty-one thousand, four hundred fifty-

nine dollars and no cents, **$781,459.00** in satisfaction of all costs of cure to the effective date of the Agreement.

## 3.0   NIAGARA MOHAWK OPTICAL GROUND WIRE

3.1    Niagara Mohawk agrees to provide to Licensee the use of certain fiber optic strands within Niagara Mohawk's optical ground wire (hereinafter "OPGW") on Niagara Mohawk's transmission line facilities from: (i) Scriba, NY to Clay, NY – 16 strands; and (ii) Black River, NY to Lighthouse Hill, NY – 8 strands.

3.2    All OPGW that may be provided by Niagara Mohawk to Licensee are single mode and shall be provided on an "as-is" and "where-is" basis, without warranties of any kind or nature, including without limitation, any express or implied warranties of merchantability or fitness for a particular purpose.

## 4.0   NIAGARA STRANDS

4.1    The Licensee hereby acknowledges and agrees that Licensee's acquisition of Telergy's property is subject to Niagara Mohawk's indefeasible and marketable ownership and title and all incidents and benefits of ownership of the Niagara Strands. The Licensee further acknowledges and agrees that it shall not take or cause to be taken any action in connection with the fiber optic cable containing the Niagara Strands that may impair, burden, harm or otherwise diminish Niagara Mohawk or its assign'(s) interests in or utilization of the Niagara Strands.

4.2    The Licensee hereby agrees that it shall cooperate with Niagara Mohawk and use its reasonable best efforts to facilitate Niagara Mohawk's identification (i.e., by strand number and location) and testing of the individual Niagara Strands. The parties agree that the identification, testing and documentation of all Niagara Strands shall be completed and provided to Niagara Mohawk within ninety (90) days of entering into the Agreement, unless such period is extended by mutual agreement of the parties. Failure to identify and verify ownership of Niagara Strands shall be a material breach of the Agreement. The Licensee hereby acknowledges and agrees that:

> a.    The Niagara Strands include four (4) Niagara Strands in every fiber optic cable in or on a Duct, conduit, innerduct, pole, trench, tower, manhole, handhole, Building Entrance Link, or Regenerator facility, on Niagara Mohawk's Rights-of-Way.

> b.    Notwithstanding the foregoing, the Niagara Strands shall include six (6) continuous Niagara Strands between the Niagara Mohawk Points of Presence in 144 Kensington Avenue, Buffalo NY and 1125 Broadway, Albany, NY.  The six (6) Niagara Strands are indefeasibly owned by Niagara Mohawk in lieu of the four (4) Niagara Strands that were previously owned by Niagara Mohawk

between the Kensington Avenue, Buffalo, NY and 1125 Broadway, Albany, NY Points of Presence.

c.     Notwithstanding the foregoing, the Niagara Strands shall include four (4) continuous Niagara Strands between the Points of Presence and the Backbone Route  Where such Niagara Strands occupy Niagara Mohawk Rights-of-Way, the continuous Niagara Strands are concurrent with, and not in addition to the Niagara Strands described in the preceding paragraphs.

d.     Notwithstanding the foregoing, the Niagara Strands shall include two (2) continuous strands between 144 Kensington Avenue, Buffalo, NY and Niagara Mohawk's Lockport Station, NY.

e.     Niagara Mohawk and its Affiliates shall at all times have unrestricted use of the Niagara Strands and, Niagara Mohawk may, in its sole and absolute discretion, convey, assign, lease, license, or grant the right to use, including an irrevocable right to use ("IRU") any Niagara Strands to third party(ies).  During the term of this agreement and with regard to the Niagara Strands, if Niagara Mohawk seeks bids on the sale or lease of such strands, Niagara Mohawk agrees to include Licensee on the list of prospective bidders.  Upon sale or assignment of the Niagara Strands to other than an Affiliate, any such transferee shall be obligated to negotiate maintenance services with Licensee, at Licensee's then prevailing maintenance charges pursuant to Licensee's most favored maintenance agreement rates, terms and conditions in effect at the time.

f.     Niagara Mohawk shall be provided reasonable access to Licensee's System, Building Entrance Links, manholes, handholes, collocation space, and Regenerator facilities along the Backbone Route such that Niagara Mohawk or any assignee(s) can install and Maintain up to two (2) racks of equipment, if available, to utilize with respect the operation of the Niagara Strands.  Niagara Mohawk will provide written notice to Licensee of any assignment, other than an assignment to an Affiliate, of Niagara Capacity, Niagara Strands, or collocation capability, at least thirty (30) days prior to the making of such assignment.  In the event of an assignment to an Affiliate, Niagara Mohawk shall provide Licensee written notice within sixty (60) days following such assignment.

g.     Niagara Mohawk owns all innerduct installed in Niagara Mohawk's conduit, whether installed by Niagara Mohawk, Licensee or anyone in privity with Licensee.

h.     Licensee shall provide Niagara Mohawk with As Built Drawings showing the location and identification of all Niagara Strands within ninety (90) days of execution of the Agreement.

i.     Except as otherwise stated in the Agreement or this Addendum, Licensee's Facilities and the Licensee's System installed in accordance with the

Agreement shall be and remain the property of Licensee regardless of the method and manner of installation.

  j.  In accordance with the terms of the Agreement and the Conduit Occupancy Agreement executed between the parties, Licensee shall have access to use, occupy, and Maintain Licensee Facilities, and such access shall not be unreasonably withheld.

4.3  Niagara Mohawk, its Affiliates, and assignees, shall reimburse Licensee for a pro rata share of its actual third-party costs incurred in providing Niagara Mohawk with collocation space for Niagara Mohawk and any assignee's use.

4.4  All ongoing operational activities, monitoring, maintenance, location, repair and restoration costs related to the Licensee's fiber optic cable and the Niagara Strands located within the cable shall be performed at Licensee's sole cost and expense, subject to Niagara Mohawk review and inspection. Licensee shall be entitled to hire a qualified telecommunications maintenance company to perform monitoring, maintenance, location, repair and restoration activities with respect to Licensee Facilities, subject to Niagara Mohawk's approval, which shall not be unreasonably withheld. Access to the Niagara Mohawk Rights-of-Way shall be in accordance with the terms of the Agreement.

4.5  Licensee's obligation under this Addendum, the Right of Occupancy Agreement, the Conduit Occupancy Agreement, and its Addendum, to provide Niagara Strands and Niagara Capacity under Sections 4.0 and 5.0 is subject to Licensee's confirmation prior to seven (7) days before any hearing on a motion to assume and assign executory contracts in In Re:Telergy, Inc. et al. In the event Licensee would otherwise be obligated to design, construct or install additional Licensees Facilities that would cost Licensee greater than $250,000.00, Licensee may provide written notice to Niagara Mohawk prior to such seven (7) day period, of such additional costs and the parties shall agree to either: 1) substitute performance, or 2) Licensee's agreement shall be terminated hereunder and thereunder.

## 5.0 NIAGARA CAPACITY

5.1  Licensee shall restore and provide continuous Niagara Capacity to the Points of Presence. Licensee hereby acknowledges and agrees that the Niagara Capacity shall include:

  a.  Five (5) OC-3s of capacity along the Backbone Route between the Points of Presence with a minimum cross connect fabric within Licensee's network such that any DS-3 or above level circuit entering the Licensee's network could appear within an OC-3 at any POP site;

  b.  Ten (10) OC-3s between Niagara Mohawk's facility at 300 Erie Blvd West, Syracuse, NY and Niagara Mohawk's facility at Henry Clay Blvd, Liverpool, NY with a minimum cross connect fabric within Licensee's network

such that any DS-3 or above level circuit entering the Licensee's network could appear within an OC-3 at any POP site.

5.2     The Niagara Capacity shall be delivered with an availability factor of 99.999% with any required repairs being performed consistent with Licensee's priority customers. Licensee's failure to provide continuous Niagara Capacity in accordance with the requirements stated herein shall constitute a material breach of the Agreement.

5.3     Licensee shall engineer, furnish, install and maintain all electronics, cabling, and equipment to each OC-3 demarcation in the Niagara Mohawk Points of Presence.  Such demarcation will be a standard OC-3 interface termination (fiber distribution panel).

5.4     Niagara Mohawk shall engineer, furnish, install and maintain all electronics, and cabling beyond the lightwave distribution panel demarcation in the Niagara Mohawk Points of Presence.   At its sole and absolute discretion, Niagara Mohawk may provide access, floor space and support service, such as HVAC, at Niagara Mohawk's facilities.

## 6.0     PRIORITY

6.1     In the event of any conflict between the terms of the Addendum and the Agreement, the terms of this Addendum shall prevail.


ACCEPTED:                    **NIAGARA MOHAWK POWER CORPORATION**

By:(signature) _____

Name: _____
              CLEMENT E. NADEAU
              SR. VICE PRESIDENT - OPERATIONS

Title: _____

Date: _____3/22/02_____


ACCEPTED:                    **DOMINION TELECOM, INC.**

**(Licensee)**


By: (signature) _____

Name: _____
              CHARLES VASSALLO
Title: _____Vice President-Strategy,_____
              Finance & Support Services

Date: _____March 19, 2002_____

# RIGHT of OCCUPANCY AGREEMENT
## Authorizing Use of Certain Niagara Mohawk Rights-of-Way

### Table of Contents

1.   DEFINITIONS

2.   SCOPE OF AGREEMENT

3.   TERM AND TERMINATION

4.   ROUTE SELECTION AND DESIGN

5.   PROJECT APPROVALS AND PERMITS

6.   CONSTRUCTION AND INSTALLATION

7.   ADDITIONAL RIGHTS-OF-OCCUPANCY, MODIFICATIONS TO THE ROUTE

8.   MAINTENANCE AND OPERATION

9.   RELOCATION

10.  ENTRY NOTICE FOR ACCESS TO RIGHT-OF-WAY

11.  RIGHT-OF-WAY RESTORATION

12.  NIAGARA MOHAWK WORK

13.  UNAUTHORIZED USE OF NIAGARA MOHAWK RIGHT-OF-WAY

14.  PERMITTED THIRD PARTY USES

15.  INTERFERENCE WITH OTHER JOINT USERS

16.  REMOVAL OF LICENSEE FACILITIES

17.  LEGAL TITLE, TAX ACCOUNTING

18.  REPRESENTATIONS AND WARRANTIES

19.  LIMITATION OF WARRANTIES

20.  COSTS AND EXPENSES

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original
agreements are mutually signed and exchanged between the parties.

21.   NIAGARA MOHAWK COMPENSATION/FEES

22.   FORCE MAJEURE

23.   TAXES AND GOVERNMENTAL CHARGES

24.   INSURANCE

25    PROTECTION AGAINST LIENS ON PROPERTY

26.   CONDEMNATION

27.   ENVIRONMENTAL MATTERS

28.   PROPRIETARY INFORMATION

29.   ASSUMPTION OF RISK

30.   INDEMNIFICATION

31.   WAIVER OF CERTAIN DAMAGES

32.   BREACH

33.   ASSIGNMENT AND TRANSFERS

34.   NOTICES

35.   DISPUTE RESOLUTION

36.   WAIVER OF JURY TRIAL

37.   MISCELLANEOUS

38.   NEW YORK PUBLIC SERVICE COMMISSION APPROVAL


EXHIBIT I. –      APPLICATION FOR RIGHT OF OCCUPANCY

EXHIBIT II. –     TERMS AND CONDITIONS FOR THE SUPPLY OF GOODS, INSTALLATION AND MAINTENANCE SERVICES

**Confidential and Proprietary - Niagara Mohawk Power Corporation**
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

# RIGHT of OCCUPANCY AGREEMENT
## Authorizing Use of Certain Niagara Mohawk Rights-of-Way

THIS AGREEMENT, made effective this _10 th_ day of _April_, 20 _02_ between (a) Niagara Mohawk Power Corporation, a corporation organized and existing under the Laws of the State of New York, having its principal office at 300 Erie Boulevard West, Syracuse, New York ("Niagara Mohawk"), and (b) Dominion Telecom, Inc., a public service corporation organized and existing under the Laws of the State of Virginia, having its principal office at 4355 Innslake Drive, Glen Allen, VA 23060 ("Licensee"). Niagara Mohawk and Licensee are each referred to herein as a "Party" and collectively as the "Parties."

## 1.  DEFINITIONS

As used in this Agreement, the following terms shall, unless the context otherwise requires, have the meanings specified in this Section 1.

"Activation Date" shall mean the date on which the Route Segment is accepted by Licensee as operational.

"Actual Cost" shall mean Niagara Mohawk's fully allocated costs and expenses, including appropriate overhead costs, but without profit, to be paid by Licensee.

"Agreement" shall mean this Right-of-Occupancy Agreement and any attachments, exhibits, addenda and amendments thereto.

"Approved Drawings" shall mean Working Drawings that have been reviewed and approved by Niagara Mohawk pursuant to Section 4 of this Agreement.

"As Built Drawings" shall mean drawings of reproducible quality provided to Niagara Mohawk by Licensee of a System Segment or of the Licensee's Facilities, as actually installed on or in the Property.

"Construction Plan" shall mean a proposed schedule of engineering and design, commencement and completion dates for receipt of all necessary or required approvals, as set forth in Section 4 of this Agreement, and dates for construction, installation and implementation of the Licensee's Facilities.

"Duct" shall mean an individual pipe or tube forming an enclosed raceway for cable installed and owned by Licensee.

"Easement" shall mean an easement in gross and/or the highest lesser Right-of-Occupancy or use permitted to be granted by the nature of Niagara Mohawk's interest in and to its Right-of-Way.

"Entry Notice" shall mean such notice as set forth in Section 10 of this Agreement.

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

"Environmental Laws" shall mean any and all applicable federal, state, regional, county or local laws, statutes, rules, regulations, ordinances, decrees or orders concerning public health, safety or the environment, whether now existing or hereafter enacted or promulgated, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 USC Section 9601 et seq., the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Solid and Hazardous Waste Amendments of 1984, 42 USC Section 6901 et seq., the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 USC Section 1251 et seq., the Toxic Substances Control Act of 1976, 15 USC Section 2601 et seq., the Emergency Planning and Community Right-to-Know Act of 1986, 42 USC Section 11001 et seq., the Clean Air Act of 1966, as amended, 42 USC Section 7401 et seq., the National Environmental Policy Act of 1975, 42 USC Section 4321, the Rivers and Harbors Act of 1899, 33 USC Section 401 et seq., the Endangered Species Act of 1973, as amended, 16 USC Section 1531 et seq., the Occupational Safety and Health Act of 1970, as amended, 29 USC Section 651 et seq., the Safe Drinking Water Act of 1974, as amended, 42 USC Section 300(f) et seq., and all rules, regulations and guidance documents promulgated or published thereunder, and any state, regional, county or local statute, law, rule, regulation, ordinance, decree or order relating to or imposing liability or standards of conduct concerning public health, safety or the environment, including, without limitation, relating (i) to releases, discharges, emissions or disposals into air, water, land or groundwater; (ii) to the withdrawal or use of groundwater; (iii)  to the use, handling or disposal of polychlorinated biphenyls (PCB's), asbestos or urea formaldehyde; (iv) to the treatment, storage, disposal or management of hazardous substances (including, without limitation, petroleum, its derivatives, by-products or other hydrocarbons), and any other solid, liquid or gaseous substance, exposure to, which is prohibited, limited or regulated, or may or could pose a hazard to the health and safety of the occupants of the Property or the property adjacent to or surrounding the Property; (v) to the exposure of persons to toxic, hazardous or other controlled, prohibited or regulated substances; or (vi) to the transportation, storage, disposal, management or release of gaseous or liquid substances, and any regulation, order, injunction, judgment, declaration, notice or demand issued thereunder.

"Estimated Cost" shall mean a reasonable, good faith estimate of the Actual Cost.

"Extension Period" shall mean the two, ten-year options, exercisable by Licensee in accordance with, but subject to, the terms and provisions of this Agreement, to extend the Initial Term of this Agreement or any extension thereof with respect to the Right-of-Occupancy used in connection with the Licensee's System.

"Fiber Optic Ground Wire" or "OPGW" shall mean optical ground wire in which optical filaments are encased in a core surrounded by steel or aluminum strands, which provide lightning protection and grounding functionality for the transmission line.

**Confidential and Proprietary - Niagara Mohawk Power Corporation**
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

"Good Utility Practice" shall mean any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry during the relevant time period, or any practices, methods and acts which, in the exercise of good judgement in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at the lowest reasonable cost consistent with good business practices, reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method or act, to the exclusion of all others, but rather to be acceptable practices, methods, or acts generally accepted in the region and consistently adhered to by Niagara Mohawk. Good Utility Practice shall include, without limitation, conformance to the policies, criteria, practices, guidelines and requirements of the National Electric Reliability Council, the Northeast Power Coordination Council and the NY Independent System Operator or their successor organizations.

"Hazardous Substances" shall mean petroleum products (including its derivatives, by-products or other hydrocarbons), flammable explosives, radioactive materials, asbestos or any material containing asbestos, polychlorinated biphenyls, and any hazardous, toxic or dangerous waste, substance or material defined as such, or as a "Hazardous Substance" or any similar term, in the Environmental Laws.

"Initial Term" shall mean the initial twenty-five (25) year-period of this Agreement, commencing on the effective date of this Agreement.

"Licensee" shall mean the Party that applies for and is granted permission by Niagara Mohawk under this Agreement to place Licensee's Facilities on Niagara Mohawk's Right-of-Way and which is responsible for compliance with Niagara Mohawk's policies, rules and standards from time to time in effect regarding such accommodations.

"Licensee Facilities" means telecommunications facilities installed by or on behalf of Licensee in, on, upon, under, across, along and through the Right-of-Occupancy on a Right-of-Way, including the transmission systems designed to and used to carry communications traffic and including Duct, carrier pipes, cables, fibers, junctions, Regenerators, power sources, fault alarm systems, electronics, structures or shelters, towers, satellite earth stations and all other personal property necessary for or useful to the construction, installation, operation, maintenance, repair, reinstallation, replacement, relocation and removal of the Licensee's System.

"Maintenance" or "Maintain" shall mean maintenance, repairs, upgrades, relocations, replacement, reinstallation, inspection and removal activities.

"Niagara Mohawk" shall mean the Niagara Mohawk Power Corporation, its successors and assigns.

"Niagara Mohawk Facilities" shall mean gas and electric transmission poles, towers, structures, wires, conductors, pipes, pipelines, conduit, innerduct and necessary appurtenances above, upon and below ground located within Niagara Mohawk's Right-of-Way, as well as Niagara Mohawk buildings and structures.

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

"Occupancy Fee" shall mean the monthly fee Licensee shall pay to Niagara Mohawk under this Agreement, as provided in Section 21 of this Agreement.

"Payment Commencement Date" shall mean the date the initial monthly Occupancy Fee shall become due and payable in full.  For each Route, the Payment Commencement Date shall be (a) ninety (90) days after the start of construction of such Route, or (b) the Activation Date, whichever occurs first.

"Pre-Construction Survey" shall mean the work operations performed by Niagara Mohawk or its designated contractor in order to process an application for a Right-of-Occupancy.

"Property" shall mean Niagara Mohawk's real property, Right-of-Way and the Niagara Mohawk Facilities thereon.

"Property Drawings" shall mean the Niagara Mohawk Right-of-Way drawings, plan and profile drawings for a Right-of-Way within which Licensee has or proposes a Right-of-Occupancy.

"Regenerator" shall mean a facility that receives, regenerates, and retransmits a digital telecommunications transmission signal, together with attendant equipment and structures, including power sources.

"Right of Occupancy" or "Right-of-Occupancy" shall mean the rights to occupy Niagara Mohawk Property granted pursuant to this Agreement.

"Right-of-Way" or "Rights-of-Way" shall mean the area of Niagara Mohawk real property owned or controlled in fee, easement, license, permit, franchise or otherwise, for electric and gas transmission lines, as defined by the Niagara Mohawk Property Drawings and other property record documents.

"Route" shall mean that portion of Niagara Mohawk's Right-of-Way occupied or to be occupied by Licensee Facilities.

"Route Segment" shall have the meaning attributed to the term System Segment.

"System Segment" or "Segment" shall mean a portion of the Licensee's Facilities installed on Niagara Mohawk's Right-of-Way.

"System" or "Licensee's System" shall mean the Licensee Facilities to the extent the same primarily utilizes optical fiber cable as the means for transmitting voice, data or video and/or other information pursuant to this Right-of-Occupancy Agreement.

"Third Party" or "Third Parties" shall mean, individually or collectively, any party, person or entity that is not a signatory to this Agreement.

**Confidential and Proprietary - Niagara Mohawk Power Corporation**
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

"Working Drawings" shall mean drawings prepared by Licensee and submitted to Niagara Mohawk for approval depicting the engineering design, construction plans and configuration of the Backbone Network and/or System Segments.

## 2. SCOPE OF AGREEMENT

(a)     Application for the Grant of a Right of Occupancy.  Licensee shall submit a completed "Application for Right of Occupancy" in the form of Exhibit I, attached hereto, within twenty-four (24) months of the effective date of this Agreement to Niagara Mohawk for its review and approval, which approval shall be granted or denied in Niagara Mohawk's sole and absolute discretion.

(b)     Nature of Rights Granted.  The rights granted to Licensee pursuant to this Agreement shall constitute a Right-of-Occupancy of the Right-of-Way to the extent that such Right-of-Occupancy is expressly permitted pursuant to the terms of the applicable contracts, deeds, agreements, easements, leases, licenses, permits or franchises conveying to Niagara Mohawk its individual legal rights in any Right-of-Way subject to this Agreement.  The Right of Occupancy granted pursuant to this Agreement does not provide Licensee with any legal or beneficial ownership interest in any Property, and shall be for Licensee's sole use and purpose, except for Permitted Third Party Uses provided for herein.

(c)     Non-Exclusivity; Third Party Rights.   Nothing herein contained shall be construed as a grant by Niagara Mohawk of any exclusive Right-of-Occupancy, right or privilege to Licensee.  Niagara Mohawk shall have the absolute right, without notice to Licensee, to grant, renew and extend Right-of-Occupancy, rights, licenses and privileges to Third Parties, by contract or otherwise, to use any Niagara Mohawk Facilities or Right-of-Way covered by this Agreement.  The rights of Licensee shall at all times be subject to such existing and future Right-of-Occupancy agreements or arrangements.  Niagara Mohawk, in negotiating and entering into any such future Right-of-Occupancy agreements or arrangements, shall not diminish the existing Right-of-Occupancy of Licensee, as provided for in this Agreement, except as provided herein.

(d)     Securing Additional Land Use Rights.  Nothing contained herein shall be construed to compel Niagara Mohawk to construct, reconstruct, retain, extend, repair, place, replace or Maintain any Right-of-Way or Niagara Mohawk Facilities or Right-of-Way not needed for Niagara Mohawk's own service requirements, as determined from time to time by Niagara Mohawk in its sole and absolute discretion.  It is understood that Niagara Mohawk's Right-of-Way may not be sufficient to permit Licensee to use the Property for the purpose set forth.  In any instance where it is determined that the Right-of-Way may not be sufficiently broad to permit Licensee to use the Right-of-Way or any other Property, Licensee may unilaterally obtain any required land use rights, provided that the acquisition thereof does not adversely affect, in any respect, Niagara Mohawk's ownership and/or use of the Right-of-Way or its Property or the use of the Right-of-Way or such Property by permitted Third Parties.  Nothing herein shall be construed to obligate Niagara Mohawk to acquire any Right-of-Way or property

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

Page 7 of 41

for Licensee's use, nor shall Niagara Mohawk be obligated to grant a Right-of-Occupancy where such grant would, in Niagara Mohawk's judgment, contravene any restriction or condition on Niagara Mohawk's use of a Right-of-Way or otherwise adversely affect existing or planned Niagara Mohawk's Facilities or Niagara Mohawk's property rights on any Right-of-Way.  All costs and expenses arising out of, in connection with or as a consequence of obtaining such land use rights (including, but not limited to, attorneys' fee and settlements made with fee owners to purchase land use rights) shall be paid by Licensee, either as reimbursement to Niagara Mohawk or as direct payments to the fee owners, whichever is applicable, and nothing construed hereby shall obligate Niagara Mohawk to obtain nor allow Licensee to acquire any land use right that could reasonably be expected to adversely affect Niagara Mohawk's ownership and/or use of its Property or the use of such Property by any permitted Third Party.  Niagara Mohawk reserves the right to relocate, operate and Maintain the Niagara Mohawk Facilities or Right-of-Way in such a manner as will best enable it to fulfill its own service requirements.

(e)     Information Regarding Niagara Mohawk's Land Use Rights.   Niagara Mohawk does not warrant the validity or apportionability of any rights it may hold to place the Licensee's System or Licensee Facilities within its Right-of-Way.  Niagara Mohawk will, upon written request by Licensee, subject to the confidentiality provisions set forth in Section 28 of this Agreement, provide available information and copies of any documents in its files pertinent to the nature of the rights Niagara Mohawk possesses over its Right-of-Way.  The cost of providing such information and reproducing documents shall be borne by Licensee, and shall be payable within thirty (30) days of the issuance of an invoice therefor.

(f)     Third Party Land Use Fees.  Licensee shall be responsible for payment of or upon invoice, reimbursement of any fees payable to any landowner or federal, state, or local governmental agency for the use of any private or public property, including but not limited to, the Right-of-Way as a result of Licensee's placement of Licensee's System or use of or right to use the Licensee System.  Costs incurred by Niagara Mohawk (including, without limitation, all costs associated with determining the adequacy of existing permits or authorizations, costs to obtain any additional permits or authorizations, and costs or fees associated with the placement of Licensee's System or use of or right to use the Licensee System) shall be compensated as part of Niagara Mohawk's Actual Cost, and shall be due and payable in full within thirty (30) days of the issuance of an invoice therefor.

(g)     Release Fees and Costs.  In the event that Niagara Mohawk attempts, in connection with this Agreement, to secure nondefeasance agreements or other releases, approvals, consents and/or waivers as may be required, in Niagara Mohawk's judgment, to ensure that such grant to Licensee is not subject to the prior rights of any Third Party, Licensee shall pay all of Niagara Mohawk's costs attributable to such action by Niagara Mohawk or its agents associated with such releases (including, without limitation, costs to prepare and submit applications for such releases and costs of documenting the same), but not market value fees necessary to secure such releases.

(h)     Niagara Mohawk's Right to Deny a Right-of-Occupancy.  Without limiting any other right or remedy granted to Niagara Mohawk pursuant to this Agreement, it is expressly

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

understood and agreed that, at any time prior to the installation of any Licensee Facilities, Niagara Mohawk shall have the right to deny or terminate a Right-of-Occupancy, without liability, upon prompt notice to Licensee, that it reasonably deems unsuitable for Licensee Facilities.

## 3.  TERM AND TERMINATION

(a)    Initial Term.  This Agreement shall be for an Initial Term of twenty-five (25) years commencing on the effective date of this Agreement and ending at midnight on the last day of the three-hundredth (300th) month thereafter, unless earlier terminated or unless extended pursuant to this Agreement, subject to the terms and conditions set forth in this Agreement.

(b)    Option to Extend.  Niagara Mohawk hereby grants to Licensee and its successors and assigns, the right and option to extend the Initial Term of this Agreement with respect to the Right-of-Occupancy in its entirety or with respect to any System Segments, from the date upon which it would otherwise expire for up to two (2) consecutive Extension Periods of ten (10) years each.  Each Extension Period may be exercised individually as to each System Segment or collectively as to any two or more System Segments, by written notice to Niagara Mohawk, twenty four (24) months prior to the expiration of the Initial Term or an Extension Period (as the case may be) as to each such System Segment (hereinafter "Election Date").  Such notice shall specify Licensee's election either to exercise its said option for the next Extension Period, or terminate this Agreement in total or part, upon a date which shall be no sooner than twenty-four (24) months from the date of such notice to Niagara Mohawk.

(c)    Automatic Extension.  In the event Licensee does not give Niagara Mohawk notice of election with respect to any System Segment on or before the Election Date with respect to any Extension Period, the Initial Term of this Agreement shall automatically be extended for thirty (30) days after notice from Niagara Mohawk notifying Licensee that it has failed to notify Niagara Mohawk of any election.  Within thirty (30) days of receipt of the Niagara Mohawk notice, Licensee shall either exercise its said option for the next Extension Period, or terminate this Agreement with respect to any System Segment upon a date that shall be no sooner than twenty-four (24) months of the date of such response.

(d)    Termination of Route Segment.  Any Route Segment may be terminated by Niagara Mohawk at any time if it cannot obtain all regulatory approvals needed by it to perform its obligations under this Agreement with respect to such Route Segment or can obtain them but only on terms that are unacceptable or unreasonably burdensome to Niagara Mohawk. Additionally, Niagara Mohawk reserves the right to terminate any Route Segment that adversely affects or could reasonably be expected to adversely affect, in any respect, existing or planned Niagara Mohawk Facilities.

(e)    Licensee's Obligations Upon Termination.  Unless the Licensee Facilities shall be abandoned pursuant to and in accordance with Section 16 of this Agreement, upon termination of this Agreement or Route Segment for any reason, Licensee will remove all

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

Licensee Facilities and perform any restoration work required by Niagara Mohawk within thirty (30) days from the date of such termination, surrender the rights and privileges hereby granted and quit the Property.  In the event that Licensee fails to vacate the Property or fails to remove all of Licensee's Facilities within thirty (30) days from the date of termination and the Licensee Facilities shall not have been abandoned pursuant to and in accordance with Section 16 of this Agreement, Niagara Mohawk shall have the right to remove the remaining Licensee Facilities, in which event such Licensee Facilities may be retained by Niagara Mohawk as its property without accounting to Licensee therefor, and the expense of such removal and repairs shall be charged to and paid by Licensee without credit for the value, if any, of such Licensee Facilities.

## 4.  ROUTE DESIGN AND ENGINEERING

(a)     Site Locations.  Upon executing this Agreement, the Parties agree to work in the preparation of Working Drawings reflecting preliminary and final sites for the Right-of-Occupancy within any Right-of-Way.  In the event that Niagara Mohawk shall agree, in its sole discretion, to undertake any Licensee requested special Right-of-Way research and services, or engineering services, Licensee shall pay all costs incurred in providing such research and services or shall reimburse Niagara Mohawk within thirty (30) days of the issuance of an invoice therefor.

(b)     Project Managers.  Each party shall designate a project manager ("Project Manager").  Whenever either party is entitled to approve a matter, the Project Manager for the party responsible for the matter shall notify the Project Manager of the other party of the nature of such matter.  The Project Managers shall discuss such matter, and each Project Manager is hereby authorized to approve or reject such matter on behalf of his/her company.  Notwithstanding the foregoing, Project Managers shall have no authority to amend the provisions of this Agreement.

(c)     Documents To Be Provided To Licensee.   To facilitate Licensee's determination of the specific position and location of the System and to prepare the Construction Plan, Niagara Mohawk agrees to provide Licensee with the materials and documents as described in this Section, at Licensee's sole cost and expense.

(i)     Prior to commencement of System design, Niagara Mohawk will provide Licensee with Niagara Mohawk's standard engineering guidelines from time to time in effect for construction plans.

(ii)     Upon request, Niagara Mohawk will provide reasonable access to available title documentation within Niagara Mohawk's possession that relate to the proposed System, including easements, occupancy rights or any third-party rights heretofore granted and restrictions on the Right-of-Occupancy intended by this Agreement.

(iii)     Upon request, Niagara Mohawk will provide reasonable access to Right-of-Way maps and survey records for inspection and reproduction by Licensee, subject to

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

applicable limitations and restrictions of survey contracts, regulations, laws or orders of any public or government authority having jurisdiction or any other applicable limitations or restrictions imposed by contract.

    (iv)    Niagara Mohawk does not guarantee the accuracy of any title documentation, Right-of-Way maps, drawings or surveys.

    (v)    Licensee shall abide by the confidentiality provisions set forth in Section 28 of this Agreement with respect to Niagara Mohawk maps, land use rights and surveys.

    (d)    **Surveying and Other Studies.**  Niagara Mohawk shall permit Licensee's employees, agents and contractors to enter the Right-of-Way, subject to the notice provisions set forth in Section 10 of this Agreement and the indemnification provisions set forth in Section 30 of this Agreement, and the limitations on access relating to any Niagara Mohawk Property, for the purpose of surveying and inspecting the same and to make such engineering and other tests as may be necessary or advisable to enable Licensee to prepare Working Drawings and the Construction Plan, as well to locate the Licensee Facilities and Right-of-Occupancy on such Right-of-Way, and to determine the engineering and cost consideration with respect to construction and installation of the System therein.

    (e)    **Joint Review and Inspection.**  Niagara Mohawk agrees to participate with Licensee in a joint review, at Licensee's cost, of the preliminary Route, and in making reasonably necessary physical inspections of the Right-of-Way for the purpose of identifying problem areas, arriving at suitable alternatives, and defining final Routes.  Such joint review shall not relieve Licensee of responsibility for such review, and Niagara Mohawk shall not be liable for any failure to identify problem areas, whether known or unknown.

    (f)    **Working Drawings.**  Based upon the preliminary Right-of-Occupancy designation, physical inspections and other engineering data available to Licensee, Licensee shall prepare and submit to Niagara Mohawk four (4) sets of Working Drawings for the System within four (4) months of the Application for Right of Occupancy.  Licensee may submit such Working Drawings for the entire System, or with mutual agreement, for designated portions thereof.  The Licensee shall designate the proposed location and manner in which the Licensee's Facilities will enter and exit Niagara Mohawk's Right-of-Way, including interconnection to the Licensee's Network.   Niagara Mohawk shall have the right to review and approve the proposed interconnections, entries and departures from the Right-of-Way.  Niagara Mohawk shall have the right to require modifications, additions or deletions to the Working Drawings or related data if modifications, additions or deletions may be required, as determined by Niagara Mohawk in its sole discretion, to maintain the integrity of and safe and reliable operation of Niagara Mohawk Facilities or Niagara Mohawk's property rights or permits associated with either of them.  All detailed specifications, construction working prints and other information directly related to the design, installation or Maintenance of the System shall be subject to Niagara Mohawk's approval.   Niagara Mohawk expressly agrees that its review and approval will not be unreasonably withheld.  Promptly following receipt of any objections to the Working Drawings

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

or related data made by Niagara Mohawk, Licensee shall correct the Working Drawings by making appropriate changes thereto and resubmitting them to Niagara Mohawk for approval by Niagara Mohawk. Costs incurred by Niagara Mohawk in connection with the review(s) shall be borne by Licensee and compensated as part of Niagara Mohawk's Actual Cost.

(g)     As-Built Drawings.   Within four (4) months following completion of installation and construction of Licensee's System on a Route Segment, Licensee shall provide Niagara Mohawk with four (4) copies of all As-Built Drawings, maps, site plans and surveys, at no cost to Niagara Mohawk.  Recording and transfer of information on As Built Drawings by Niagara Mohawk to Niagara Mohawk's permanent engineering and Right-of-Way records shall be at Licensee's expense.  As Built Drawings shall become Exhibits to and form a part of this Agreement upon verification and approval by Niagara Mohawk.

## 5.  PROJECT APPROVALS AND PERMITS

(a)     Necessary Permits and Approvals.  Licensee shall secure, at its expense, all necessary or required, final and unconditional approvals, permits and licenses from all applicable governmental authorities (including any agency thereof) and other Third Parties having jurisdiction or approval rights with respect to the use and/or occupation of the Right-of-Way, the provision of communications services, and/or the installation, operation and Maintenance of the System within the Right-of-Way, specifically including, without limitation, any and all necessary easements, licenses, permits, permissions, certifications, franchises or consents necessary to construct, operate and/or Maintain the System on private or public property and any required environmental approvals. Environmental impact assessments or statements required by law, contract or otherwise, if any, shall be prepared by or on behalf of Licensee at its sole risk, cost and expense, and copies thereof shall be provided to Niagara Mohawk promptly after preparation thereof.

(b)     Cooperating In Securing Permits and Approvals.  If required by applicable law, statute, rule, order or regulation, and upon Licensee's request, Niagara Mohawk agrees to review and exercise commercial reasonably efforts to cooperate with Licensee's efforts to secure any permits or consents necessary to install, operate or Maintain Licensee's System.  Costs incurred by Niagara Mohawk to review and facilitate any such permits or consents shall be borne by Licensee and compensated as part of Niagara Mohawk's Actual Cost.

(c)     Permit and Approval Review.  With respect to any permits or approvals required of governmental authorities or any Third Party, Niagara Mohawk shall have the right to review all applications therefor prior to Licensee submittal, and review and approve the terms and conditions of any such approvals to insure that they are compatible with the continued use and maintenance of Niagara Mohawk's Facilities and Rights of Way.

## 6.  CONSTRUCTION AND INSTALLATION

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

(d)     Commencement of Construction/Installation.  Upon receipt of all approvals in accordance with Section 5 of this Agreement, as well as the Approved Drawings and Niagara Mohawk's approval of the Construction Plan, Licensee's installation and construction of Licensee Facilities in accordance with this Agreement may commence, subject to this Section 6 of the Agreement.

(e)     Pre-Construction Meeting.   Prior to the commencement of construction, Licensee shall hold a pre-construction meeting with its contractors, sub-contractors, and Niagara Mohawk to review construction and safety practices and requirements.

(f)     No Installation Without Niagara Mohawk's Consent.  Except in emergency situations, in no event shall Licensee install any Licensee Facilities on the Right-of-Way without prior consent of Niagara Mohawk.   As set forth in Section 4 of this Agreement, Working Drawings for all proposed Licensee installations shall be submitted to Niagara Mohawk for its review and approval before the commencement of any such installation.  Moreover, in the event Licensee proposes construction of Licensee Facilities on Right-of-Way occupied by any Third Party, Licensee shall notify such Third Party occupant(s) of the proposed installation and address all concerns or requirements of said Third Party.

(g)     Entry Notice Required.  Prior to commencement of construction, Licensee shall make Entry Notice pursuant to Section 10 of this Agreement.

(h)     Excavation Work.   Prior to any excavation work, Licensee shall provide required notification to the respective owners and operators of underground facilities, as required under 16NYCRR Part 753 "Protection of Underground Facilities."   Additionally, all excavation work activities (including, without limitation, construction vehicle use) on Niagara Mohawk Right-of-Way shall require Niagara Mohawk prior written approval.

(i)     Construction Plan.  Licensee shall furnish to Niagara Mohawk a Construction Plan consisting of a detailed work schedule for the design, construction, and implementation of the proposed System.  The Construction Plan shall be updated monthly throughout the duration of construction.  The Construction Plan shall not be binding on the Parties but shall be an indication of proposed construction and installation, unless otherwise specified in this Agreement.

(j)     Labor, Equipment and Supplies; Work Performance; Specifications.   All labor, materials and equipment necessary to construct and install Licensee Facilities shall be at Licensee's expense, except as herein otherwise expressly set forth.  All Licensee work shall be performed in a good and workmanlike manner and in compliance with all applicable laws, ordinances, codes and regulations, and approvals of any governmental authorities having jurisdiction, and applicable Niagara Mohawk construction standards, practices and procedures from time to time in effect.  Licensee agrees to diligently complete all such construction in a timely manner and without unreasonable delay (excepting any Force Majeure Event).   The System shall be placed, Maintained, relocated or removed in accordance with Niagara Mohawk's requirements and specifications from time to time in effect, and all approvals, laws, statutes,

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

orders, rules and regulations of any governing authority having jurisdiction, including, without limitation, the State of New York 16NYCRR Part 753, the National Electric Code (NEC), the National Electrical Safety Code (NESC), Rules and Regulations of the Occupational Safety and Health Act (OSHA). Where a difference in specification may exist, the more stringent shall apply. Niagara Mohawk reserves the right to specify the type of construction standards and practices to be utilized, and safety requirements required in situations not otherwise covered in this Agreement.

(k)   Coordination with Other Facilities; Above-Ground Work.  All access and Licensee work activities conducted in and around Niagara Mohawk Facilities shall be coordinated with Niagara Mohawk.   At no time shall Licensee's employees, agents, or contractors climb any of Niagara Mohawk's electric transmission structures or be elevated above the ground by equipment or other means on Niagara Mohawk's Right-of-Way without Niagara Mohawk's written authorization and, to the extent deemed necessary by Niagara Mohawk, without an authorized Niagara Mohawk representative present.

(l)   Contractors and Subcontractors.  In the event that the System installation, repair or Maintenance is performed by a contractor or sub-contractor of Licensee, Niagara Mohawk shall have the right to review and accept such contractor or sub-contractor, which acceptance shall not be unreasonably withheld.  Licensee shall be responsible for all acts of its contractors and subcontractors, and shall ensure its contractors' and subcontractors' compliance with the provisions of this Agreement.

(m)   Compliance With Working Drawings; Applicable Laws.  Officers, employees, agents, representatives and contractors of Licensee shall construct, Maintain, and operate the System in accordance with the Approved Drawings, the terms and conditions of this Agreement and all applicable laws, statutes, orders, rules and regulations, and while on any Niagara Mohawk Property, shall comply with all applicable laws, statutes, orders, rules and regulations, including without limitation, those imposing security, environmental and safety requirements. Notwithstanding anything set forth in this Agreement to the contrary, Niagara Mohawk shall have no liability for any failure of Licensee Facilities to comply with, or for any failure of any officer, employee, agent, representative or contractor of Licensee to comply with, any applicable laws, statutes, orders, rules or regulations.

(n)   No Interference.  In no event whatsoever shall the System or any Licensee Facilities physically, electronically, inductively, or otherwise interfere with Niagara Mohawk Facilities or the facilities of any Third Party authorized by Niagara Mohawk to utilize the Right-of-Way or any other Property.

(o)   Utilities; Power Supply.  As requested by Licensee, Niagara Mohawk, where franchised and reasonable, shall provide to Licensee at the Regenerator sites, metered electric service, the cost of which shall be paid by Licensee in accordance with applicable New York State Public Service Commission approved tariffs.  At each Niagara Mohawk approved location along the Licensee's System, Licensee shall have the right to install, Maintain, operate, repair, replace and remove, at Licensee's sole cost and expense, utilities required to service the System,

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

including auxiliary and primary power sources and water and sewer lines; provided that such installation, Maintenance, operation, repair, replacement and/or removal does not adversely affect, in any respect, Niagara Mohawk's ownership and/use of the Right-of-Way or the use of occupancy of any Niagara Mohawk Property by Third Parties. Power sources installed by Licensee or caused to be installed by the Licensee shall meet all applicable National Electrical Codes, Niagara Mohawk standards, as well as all applicable federal, state and local requirements. Any material deviations from Niagara Mohawk's standard engineering guidelines from time to time in effect shall require prior written approval of Niagara Mohawk. When required by the utility company, power supplier or municipality providing such services, Niagara Mohawk shall grant access in accordance with Section 2 of this Agreement, and Right-of-Occupancy within the Right-of-Way to such utility company, power supplier or municipality.

(p)    Use of Temporary Structures. During construction of the System, Niagara Mohawk agrees to allow Licensee and its contractors and subcontractors, without charge, to use portions of the Right-of-Way at Niagara Mohawk pre-approved locations for the erection of temporary structures and fences to protect Licensee's construction materials, equipment and fuel; provided that (i) no adverse impact to Niagara Mohawk's Facilities, operations or environmental requirements shall result therefrom, (ii) no adverse impact to any Third Parties' facilities or operations shall result therefrom, and (iii) all such structures and fences shall be removed by Licensee promptly following completion of construction of the System.

(q)    Cable Installation.

(i)    Unless otherwise approved by Niagara Mohawk in writing, (i) all buried Licensee Facilities installed longitudinally on the Right-of-Way shall be placed at a minimum depth of four (4) feet below final grade; (ii) all Licensee Facilities crossing or exiting the Right-of-Way shall be placed at a minimum depth of six (6) feet below final grade; and (iii) all splices in Licensee's fiber optic cables shall be located in manholes, pull boxes or hand holes.

(ii)    Cables crossing under public roadways, railroad tracks, or over or under public utilities, shall be at a location and depth as determined by federal, state and local conditions, laws, regulations, approvals or orders of applicable public and/or governmental authorities having jurisdiction, and shall also be in accordance with the Approved Drawings, the Construction Plan and applicable construction standards from time to time in effect.

(iii)    Within thirty (30) days of completion of installation of the Licensee Facilities, Licensee, at its sole cost and expense, shall furnish, erect and thereafter maintain cable markers designating all underground facilities. Such markers shall be installed along the System running line and at all road and railroad crossings. The cable markers shall be placed in conformity with industry standards from time to time in effect or as otherwise approved by Niagara Mohawk.

(r)    Regenerator Buildings.

(i)    Regenerator Buildings Located In The Right-Of-Way.    No

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

Regenerator building(s) shall be located within any Right-of-Way without Niagara Mohawk's prior written consent. Niagara Mohawk shall be under no obligation to permit or consent to buildings or Licensee-owned above-grade facilities on Niagara Mohawk Right-of-Way. Any proposal made by Licensee to locate Regenerator facilities on Niagara Mohawk Right-of-Way shall also be subject to rate development (i.e., additional charges for placement of above-grade facilities) for such use. If Niagara Mohawk shall consent to any such proposal, Licensee shall be responsible for the design and construction of the Regenerator buildings, and shall reimburse Niagara Mohawk within thirty (30) days of the issuance of an invoice, for any and all costs and expenses incurred in connection with Niagara Mohawk's review of any proposed Regenerator facilities.

(ii)     Regenerator Buildings Located Adjacent To The Right-of-Way. To the extent Regenerator buildings are constructed adjacent to a Right-of-Way, Licensee shall be responsible for obtaining any required consents, permits and approvals from Third Party property owners and any applicable public or governmental authority having jurisdiction for all such use, including without limitation, installation, maintenance and operation of Licensee's Facilities on said Third Party's property.

(s)     Changes to Existing Facilities or Other Equipment. If, in the conduct of work, any changes or alterations, permanent or temporary, in existing pipelines, sewers, drains, Ducts, fences, power, signal or communication lines or other installed facilities are necessary, such changes shall be made or caused to be made, by Licensee and at Licensee's sole risk, cost and expense. In no event shall Licensee construct any Regenerator building or facility at any location that adversely affects or could reasonably be expected to adversely affect any Niagara Mohawk Facilities or Property.

## 7. ADDITIONAL RIGHTS-OF-OCCUPANCY; MODIFICATIONS TO THE ROUTE

Subsequent to the construction of the System, should the Licensee propose to install additional Ducts, cable or facilities on a Right-of-Way currently occupied by the Licensees' System, or if any part of Licensee's System requires modifications deemed material by Niagara Mohawk, Licensee shall make such application in accordance with Section 2 of this Agreement. Granting of any such request is subject to Niagara Mohawk's sole and absolute discretion. Costs incurred by Niagara Mohawk to evaluate such requests shall be borne by Licensee and shall be compensated as part of Niagara Mohawk's Actual Cost.

## 8. MAINTENANCE AND OPERATION

(a)     Maintenance and Operation Generally. Following the completion of construction of the Licensee's System and in accordance with this Agreement, the operation and Maintenance of said System, including Right-of-Way restoration and owner/operator responsibilities under 16NYCRR Part 753 "Protection of Underground Facilities," shall be Licensee's responsibility and shall be performed solely at Licensee's cost.

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

(b)     Entry Notice Required.  All Maintenance associated with the System and ongoing operational activities shall require issuance of an Entry Notice pursuant to Section 10 of this Agreement.

(c)     Right-of-Way Maintenance.   To the extent that Niagara Mohawk's maintenance of a Right-of-Way encompasses a Licensee Right-of-Occupancy, Niagara Mohawk will provide such standard maintenance services without cost to Licensee, unless the existence of the Licensee System results in any incremental increase in the Right-of-Way Maintenance cost or such Right-of-Way Maintenance cost is provided for the sole benefit of Licensee.  In such event, Licensee shall reimburse Niagara Mohawk for the incremental cost of said Right-of-Way Maintenance within thirty (30) days of the issuance of an invoice therefor.

(d)     Niagara Mohawk Facilities.  Maintenance of Niagara Mohawk Facilities, including, without limitation, relocation or modification of such facilities, shall be performed only by Niagara Mohawk.

## 9.  RELOCATION

(a)     Relocation Required By Law.  In the event that relocation, replacement or rebuilding of Licensee Facilities is required pursuant to any applicable law, statute, order, rule or regulation of any public or governmental authority having jurisdiction, such relocation, replacement or rebuilding of Licensee Facilities shall be performed by Licensee in accordance with this Agreement and at Licensee's sole cost and expense.

(b)     Relocation By Mutual Agreement.  In the event that Niagara Mohawk and Licensee both require or request relocation, replacement, or rebuilding of the Licensee Facilities, they shall determine the pro rata benefit to each and shall share in the actual costs of such relocation, replacement or rebuilding to the extent of their individual benefit.

(c)     Relocation For Niagara Mohawk's Sole Benefit.  Without limiting any other rights or remedies granted to Niagara Mohawk under this Agreement or available pursuant to applicable law, Niagara Mohawk reserves the right to relocate or require that Licensee relocate Licensee Facilities from time to time, as Niagara Mohawk deems appropriate.  In the event that Niagara Mohawk requires or requests relocation, replacement, or rebuilding of the Licensee Facilities during the term of this Agreement for Niagara Mohawk's sole benefit, Niagara Mohawk shall pay to Licensee the actual costs of such relocation, replacement or rebuild.

(d)     Relocation Due to Damage or Destruction.  If any portion of the Licensee Facilities are damaged or destroyed at any time, such Licensee Facilities shall be promptly repaired, restored or replaced by Licensee in accordance with this Agreement and at Licensee's sole expense, unless such damage to the Cable results from the willful misconduct or gross negligence of Niagara Mohawk.

(e)     Emergency Relocations.  In the event of an emergency affecting safe and

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

reliable operation of Niagara Mohawk's Facilities, Niagara Mohawk shall be permitted to relocate the Licensee Facilities or any portion thereof without prior notice to Licensee when such notice is not practical. Niagara Mohawk shall incur no liability to Licensee or any of its customers for service interruptions in connection with any such removal or relocation.

(f)    Cooperation in Relocation Work. Niagara Mohawk and Licensee shall cooperate in performing such relocation or modifications so as to minimize any interference with the use or operation of Licensee's Facilities and Niagara Mohawk Facilities.

## 10. ENTRY NOTICE FOR ACCESS TO RIGHTS-OF-WAY

(a)    Telephonic Notice. Except for emergency situations or situations requiring expeditious action, in no event shall Licensee, its employees, agents or contractors, access Niagara Mohawk Right-of-Way or Facilities without Niagara Mohawk's prior consent, which shall not be unreasonably withheld. In all instances (including, without limitation, emergency situations), Licensee shall provide Entry Notice to Niagara Mohawk prior to accessing the Right-of-Way. Notice shall be made to:

**Niagara Mohawk Central Regional Control   (315) 460-2421**

This is a 24-hour, 7-day per week contact number. Calls shall be directed to the Supervisor on Duty,

**and**

**Director of Transmission Engineering............(315) 428-5682 or**
**Manager - Telecom Opportunities.................(315) 428-6747**

In the event contact cannot be made to the individuals above, the caller shall leave a voice message and contact number.

The caller shall provide the following information:

1.    Name of company making report/request;
2.    Location of problem or area access is requested;
3.    Name of contact person;
4.    Telephone number to call back with/to;
5.    Description of the problem or activity to be performed in as much detail as possible;
6.    Time and date the problem occurred or was discovered, and
7.    If appropriate, a statement that **"This is an emergency"** and that a problem presents a jeopardy situation to any property of Niagara Mohawk, Licensee, or others (as the case may be).

**Confidential and Proprietary - Niagara Mohawk Power Corporation**
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

Page 18 of 41

(b)    Written Notice.    Whenever Licensee desires to enter upon a Right-of-Occupancy to construct or Maintain any part or portion of the System, Licensee shall, prior to making Entry Notice as detailed above, submit a written Entry Notice request to Niagara Mohawk. Such Entry Notice shall include in reasonable detail, the location and purpose of the entry, and methods of the proposed construction, repair, replacement or other work, work schedule, and other information necessary for Niagara Mohawk to review and approve the proposed work activities. Licensee shall promptly provide to Niagara Mohawk such other information as Niagara Mohawk deems necessary to approve the particular work activities. Niagara Mohawk shall consult with Licensee and its qualified designees and agents regarding proper access approaches, procedures and requirements. Niagara Mohawk may require that a Niagara Mohawk representative accompany any representatives of Licensee having such access, the cost of which shall be paid by the Licensee.

(c)    Third Party Access.    Should Third Party access be required to the Right-of-Way or Licensee Facilities, such access shall be subject to Niagara Mohawk's prior authorization and shall be under the direct control of Licensee, unless otherwise directed by Niagara Mohawk.

## 11. RIGHT-OF-WAY RESTORATION

In the event Licensee or any of its officers, employees, agents, representatives or contractors directly or indirectly damages or disturbs the Right-of-Way, any access thereto or any lawns, gardens, shrubbery, fences or other real or personal property owned by Licensee, Niagara Mohawk or any Third Party (including, without limitation, parties to whom Niagara Mohawk now or hereafter leases or licenses any of the Right-of-Way on which Licensee Facilities are or shall be installed), Licensee, at its sole cost and expense, will promptly restore the same to Niagara Mohawk's reasonable satisfaction, but in all events to substantially the same condition as before such damage or disturbance occurred. During construction activities, daily restoration shall be performed with all construction related restoration activities completed within 120 days of the installation of Licensee's Facilities. Licensee shall, at its sole cost, continue to Maintain restored areas to Niagara Mohawk's satisfaction for a period of eighteen (18) months following completion of Licensee construction. Licensee shall correct or cause to be corrected all damaged or disturbed areas noted by Niagara Mohawk's inspectors, agents or other representatives.

Licensee shall investigate and resolve, to Niagara Mohawk's reasonable satisfaction, any and all complaints made by any Third Party arising from or in connection with any such damage or disturbance in an expeditious manner. If Licensee fails to resolve such complaints or effect such restoration within thirty (30) days of notice from Niagara Mohawk, or such faster time frame as reasonably demanded by Niagara Mohawk or any governmental or regulatory agency having appropriate jurisdiction, Niagara Mohawk shall have the right to perform the restoration work, at Licensee's sole cost and expense.

## 12. NIAGARA MOHAWK WORK AND INSPECTION

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

(a)     Inspection of Licensee Work.  With respect to any installation, construction, Maintenance and/or repair of the System or any Licensee Facilities, unless otherwise agreed to by Niagara Mohawk in writing, a Niagara Mohawk inspector, engineer or other representative shall have the right to be present and shall be authorized to terminate any installation, construction, Maintenance and/or repair when said activities pose a danger or could reasonably be expected to pose a danger to Niagara Mohawk's Facilities, as determined by such Niagara Mohawk inspector, engineer or other representative, in his/her sole discretion.  The costs of such inspection by Niagara Mohawk shall be borne by Licensee, and shall be compensated to Niagara Mohawk as Actual Costs.

(b)     Compliance with Applicable Laws, Agreements and Policies.  Niagara Mohawk work activities shall comply with Niagara Mohawk's collective bargaining agreement, as well as all applicable laws, statutes, orders, rules and regulations and all of Niagara Mohawk's policies, rules and procedures from time to time in effect.

(c)     Standards of Performance.  All engineering, installation and maintenance provided by Niagara Mohawk in support of the Right-of-Occupancy granted herein shall be performed in accordance with Good Utility Practice and under the terms and conditions of Niagara Mohawk's standard Services Agreement, the terms and conditions of which may be revised from time to time (see Exhibit II to this Agreement).

(d)     Niagara Mohawk Reviews. Niagara Mohawk's activities in reviewing, approving or supporting the engineering, design, planning, installation, Maintenance and modification efforts of Licensee and any periodic and post-construction inspections, shall impose no obligation on Niagara Mohawk for any deficiencies thereof or damages resulting therefrom, nor relieve Licensee of any responsibility, obligation or liability specified in this Agreement, unless agreed to in writing by Niagara Mohawk.

## 13. UNAUTHORIZED USE OF NIAGARA MOHAWK RIGHT-OF-WAY

(a)     Unauthorized Use of Right-Of-Way; Rights and Remedies.  If any Licensee Facilities shall be found occupying Niagara Mohawk Right-of-Way for which a Right-of-Occupancy has not been granted pursuant to this Agreement, Niagara Mohawk, without prejudice to its other rights or remedies under this Agreement, including termination or otherwise, may impose a charge and require Licensee to submit in writing, within ten (10) days after receipt of written notification from Niagara Mohawk of the unauthorized occupancy, an "Application for Right-of-Occupancy" (Exhibit I attached hereto).  If such Application is not received by Niagara Mohawk within the specified time period, Niagara Mohawk may remove Licensee's Facilities without liability, and the cost of such removal shall be borne by Licensee.

(b)     Charges For Unauthorized Use.  For the purpose of determining the applicable charge, the unauthorized occupancy of Niagara Mohawk's Facilities or Right-of-Way shall be treated as having existed for a period of five (5) years prior to its discovery; or for the period beginning with the date of this Agreement, whichever period shall be shorter, and Niagara

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

Mohawk's prevailing rates, charges and fees shall be due and payable forthwith regardless of whether Licensee is permitted by Niagara Mohawk to continue the occupancy.

(c)    No Waiver. No act or failure to act by Niagara Mohawk with regard to an unauthorized occupancy shall be deemed as a grant of consent to a Right-of-Occupancy for the occupancy, and, if any Right-of-Occupancy should be subsequently issued, it shall not, unless otherwise agreed in writing by Niagara Mohawk, operate retroactively or constitute a waiver by Niagara Mohawk of any of its rights or privileges under this Agreement or otherwise, provided, however, that Licensee shall be subject to all liabilities, obligations and responsibilities of this Agreement in regard to said unauthorized occupancy from its inception.

## 14. PERMITTED THIRD PARTY USES

Notwithstanding any provision of this Agreement to the contrary relating to any Third Party use of Licensee's System, Licensee shall be permitted to provide telecommunications capacity across Licensee's System to its customers and to sublease or sublicense to Third Parties the optical fiber strands in the Licensee's System and to provide telecommunications services to its customers ("Permitted Third Party Uses"). Any such Permitted Third Party Uses shall be subject to the terms of this Agreement.

## 15. INTERFERENCE WITH OTHER JOINT USERS

The Licensee shall design, engineer, construct and Maintain the Licensee Facilities within the Right-of-Way in a manner as to not physically conflict or interfere with Niagara Mohawk's use of the Property or any facilities attached thereon or placed therein by joint users or others.

## 16. REMOVAL OF THE LICENSEE FACILITIES

(a)    Generally. Except as otherwise expressly set forth in this section to the contrary, Licensee shall remove all of the Licensee Facilities upon termination of this Agreement for any reason. Licensee shall give Niagara Mohawk thirty (30) days prior written notice of any such removal of Licensee Facilities.

(b)    Abandonment of Licensee Facilities. Unless prohibited by applicable law, statute, order, rule, or regulation of any public or governmental authority having jurisdiction, or by any applicable Property easement or restriction, and subject to Niagara Mohawk's prior consent, Licensee may abandon in place Licensee Facilities within the Right-of-Way rather than remove therefrom any buried cable(s), Duct or other appurtenances so placed. In the event Niagara Mohawk consents to the abandonment in place of Licensee Facilities, Licensee's ownership interest therein shall be deemed (without further documentation) released and conveyed to Niagara Mohawk.

(c)    Removal of Licensee Facilities by Niagara Mohawk. Unless abandoned pursuant to the preceding paragraph, in the event Niagara Mohawk shall remove any portion of

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

the Licensee Facilities from Niagara Mohawk's Property, Niagara Mohawk will deliver to Licensee the Licensee Facilities and equipment so removed upon payment by Licensee of the cost of removal, storage and delivery, and all other amounts due Niagara Mohawk.

## 17. LEGAL TITLE & TAX ACCOUNTING

(a)     Nature of Property Rights for Accounting Purposes.   Niagara Mohawk Facilities and Niagara Mohawk Right-of-Way shall remain the property of Niagara Mohawk. Licensee Facilities and the Licensee's System installed pursuant to or in connection with this Agreement shall be the personal property of Licensee.

(b)     Accounting for Licensee's Costs; Tax Returns.   Licensee shall, for tax purposes, account for all costs borne by it and shall be entitled to any investment tax credits, depreciation and any other tax attributes or liabilities with respect to the Licensee Facilities.  The Parties agree they shall file all income tax returns and otherwise take all actions with respect to taxes in a manner consistent with the foregoing.

## 18. REPRESENTATIONS AND WARRANTIES

Each of the Parties represents and warrants that:

(a)     it is a company duly organized, validly existing and in good standing under the laws of its state of organization;

(b)     it has full power and authority to enter into and perform its obligations set forth in this Agreement;

(c)     it has taken all requisite corporate or company action to approve the execution, delivery and performance of this Agreement;

(d)     its execution and delivery of this Agreement and its performance of its obligations set forth in this Agreement shall not violate any applicable existing laws, regulations, rules, statutes or court orders of any local, state or federal government, court or political body, nor contravene any material agreement to which it is a party; and

(e)     this Agreement is a valid and binding obligation fully enforceable against such Party in accordance with its terms.

## 19. LIMITATION OF WARRANTIES

Niagara Mohawk makes no specific covenant, warranty or representation as to the suitability, fitness for a particular purpose, permissible uses, or title to the Property and/or Right-of-Way that are or will become subject to this Agreement.  Pursuant to Section 4 of this Agreement,

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

Niagara Mohawk will make available to Licensee for its review, agreements and other documents in Niagara Mohawk's possession relating to permissible uses and title to such Property or Right-of-Way. Any such documents provided or made available to Licensee shall be considered Proprietary Information in accordance with Section 28 of this Agreement.

**NIAGARA MOHAWK PROVIDES NO EXPRESS OR IMPLIED GUARANTEES OR WARRANTIES WHATSOEVER, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT AS MAY BE EXPLICITLY PROVIDED HEREIN.**

**NIAGARA MOHAWK DOES NOT WARRANT TITLE, DESCRIPTION, VALUE, QUALITY, CONDITIONS, WORKS AND ABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE ENGINEERING, WORKMANSHIP OR RIGHT-OF-WAY SUBJECT TO THIS AGREEMENT.**

## 20. COSTS AND EXPENSES

(a)   Generally.   Licensee shall pay all costs associated with the Right of Occupancy granted herein, as well as all costs associated with installation, Maintenance and operation of Licensee's System. The Parties agree that, unless expressly stated herein, Niagara Mohawk shall not be liable for any costs or expenses incurred as a result of the Right-of-Occupancy granted to Licensee pursuant to this Agreement or as the result of the Licensees Facilities or the installation, Maintenance or operation thereof. Without limiting any other term or provision set forth in this Agreement, Licensee shall pay Niagara Mohawk's Actual Cost associated with implementing this Agreement, as well as expenses for work performed at the request, benefit or obligation of Licensee pursuant to the terms herein, including, but not limited to costs of design, engineering and drawing reviews, record reviews, permitting work and fees, obtaining new or modified easements, licenses, permits or rights of way, inspection, record updates, fees, personnel time, material, equipment, travel and transportation charges, direct hourly rates, fringe benefits and applicable payroll taxes, general administrative and overhead costs, and applicable sales, income, real estate, and gross receipts taxes. Should Niagara Mohawk utilize contractors or consultants to perform Niagara Mohawk's obligations under this Agreement, Licensee shall reimburse Niagara Mohawk for its actual contracted or consultant costs, plus ten percent (10%). Upon request, Niagara Mohawk shall provide to Licensee Estimated Costs of any work to be performed by Niagara Mohawk for or on behalf of Licensee.

(b)   Costs of Materials, Maintenance and Construction. Licensee, at its sole risk, cost and expense, shall furnish all materials to be used in connection with this Right-of-Occupancy and the System, and shall construct, Maintain, and operate the System at its sole cost and expense.

(c)   Occupancy Fees.   Licensee shall also pay Niagara Mohawk monthly Occupancy Fees, as specified in Section 21 of this Agreement.

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

(d)     Invoices.  Invoices shall be issued in accordance with Niagara Mohawk's standard billing practices and will itemize occupancy fees and costs relating to labor, material, equipment and taxes.  Niagara Mohawk will provide reasonable supporting back-up for charges, if requested.

(e)     Payments; Late Fees.  Licensee shall make full payment to Niagara Mohawk of all invoiced costs (including, without limitation, occupancy fees) within thirty (30) days of issuance of an invoice.  Late fees of 1 1/2 percent per month will be imposed on all outstanding balances in excess of thirty (30) days from date of Niagara Mohawk's original invoice.

## 21. NIAGARA MOHAWK COMPENSATION/FEES

(a)     Fees Generally.  Licensee acknowledges that the fees established for use of Niagara Mohawk Right-of-Way are not based on regulatory formulas, but rather, are negotiated with Niagara Mohawk and are reasonable fees for the rights and benefits provided pursuant to this Agreement.

(b)     Occupancy Fees.

(i)     In addition to any other "Right-of-Way Fees" payable by Licensee for use of public and private property or the Right-of-Way, a monthly occupancy fee shall be paid to Niagara Mohawk by Licensee for each Duct occupied, in accordance with the schedule below, commencing on the Payment Commencement Date:

FEE SCHEDULE: (as of January 1, 2001)

| Total Miles of Duct Occupied | Monthly Occupancy Fee ($/mile/Duct/month) |
|---|---|
| 0 – 50 miles | $167 |
| 51 – 100 miles | $158 |
| 101 – 500 miles | $150 |
| > 500 miles | $125 |

(ii)     Minimum occupancy fee is one (1) mile.  All of the Duct upon the Route Segment(s) shall be measured on a linear footage basis, using the Right-of-Way monumented line-of-location stationing, when available.

(iii)     The monthly Occupancy Fee shall first become due and payable on the Payment Commencement Date.  On the third anniversary of the execution date of this Agreement, and for each three (3) year period thereafter, the monthly Occupancy Fee shall be adjusted by adding to the Occupancy Fee for the previous three (3) year term an amount obtained by multiplying the Occupancy Fee for the previous three (3) year term by the percentage of increase (if any) of the Consumer Price Index (the "CPI") for All Urban Consumers as reported

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

by the Bureau of Labor Statistics for the previous three (3) year period.  If the CPI is no longer being published, the most comparable successor shall be substituted therefore. If the CPI for the previous three (3) year period remained the same or decreased, the Occupancy Fee shall remain unchanged from the previous three (3) year period. The CPI published for the month preceding the execution date of this Agreement shall be considered the base.  The Occupancy Fee shall be due and payable in full within thirty (30) days of issuance of an invoice therefor, and late fees of 1 1/2 percent per month will be imposed on all outstanding balances in excess of thirty (30) days from date of Niagara Mohawk's original invoice.

(c)     Additional Amounts.  In addition to the amounts due and payable pursuant to the foregoing schedule, at any time during the term of this Agreement, Niagara Mohawk shall have the right to require Licensee to pay any additional fees, rates or charges associated with the Right of Occupancy that are required by applicable law, statute, rule, regulation or any valid final order of any court, regulatory agency or government body with jurisdiction over Niagara Mohawk and/or this Agreement.

## 22. FORCE MAJEURE

(a)     Generally.   Should any Force Majeure Event (defined below) occur and should Niagara Mohawk determine that as a direct or indirect result thereof, the Parties' continued performance hereunder or with respect to any portion of the Right of Occupancy will be irreparably impaired or prevented, the Parties may mutually agree to terminate this Agreement, in whole or in part as to any portion of the Route Segments so affected with no further obligation or liability.  A "Force Majeure Event" shall mean any cause beyond the control of the Party affected which could not be overcome with reasonable diligence and effort and shall include, acts of God, acts of public enemy, insurrection, war, blockages, strikes, lockouts, other labor stoppages, riots, other public disorders, storms, land slides, avalanches, floods, fires, washouts, earthquakes, lightening, civil or military disturbances, restraint by court or public authority, boycotts, embargoes, extraordinary governmental actions, and the like; it being expressly understood and agreed that financial inability shall not constitute a Force Majeure Event.

(b)     Notice.  The Party asserting that a Force Majeure Event has hindered, delayed or otherwise inhibited its ability to perform its obligations under this Agreement shall, as soon as reasonably practicable after learning of the Force Majeure Event, provide notice to the other Party hereto in writing, certifying all available facts and circumstances surrounding the occurrence of the Force Majeure Event, including, but not limited to, its cause(s), expected duration, efforts to overcome, and the claimed effect on the Party's obligations to perform under this Agreement.

(c)     Suspension Pending Force Majeure Event.  In the event that the Parties do not terminate this Agreement as a result of a Force Majeure Event, the obligations of the Parties shall be suspended to the extent made necessary by the Force Majeure Event and during its continuance; provided, however, that the Party asserting the Force Majeure Event shall take

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

prompt and reasonable action to overcome the causes of the Force Majeure Event and its performance shall be resumed immediately after such causes have been removed. At the conclusion of a Force Majeure Event the period of time so suspended shall be added to the dates, schedules and other performance related matters under this Agreement, except that the term of this Agreement shall remain unchanged. Nothing contained herein shall cause the Party affected by the Force Majeure Event to submit to what it considers to be an unreasonable labor agreement.

## 23. TAXES AND GOVERNMENTAL CHARGES

Licensee shall pay all annual or periodic real property, personal property, gross receipts, franchise taxes or other taxes, including any increase in such taxes levied or assessed to Niagara Mohawk and based upon the Right-of-Occupancy granted by this Agreement or on account of its existence and shall indemnify, defend and hold harmless Niagara Mohawk against the payment thereof. Niagara Mohawk will provide reasonable notice to Licensee of receipt of notice of assessment of property or any portion thereof, which includes an increment of such assessment attributable to the Right-of-Occupancy. Niagara Mohawk shall bill Licensee for the payment of such taxes and assessments attributable to the Right-of-Occupancy and Licensee will pay such taxes and assessments in accordance with Niagara Mohawk real estate tax policies and procedures from time to time in effect. In the event Niagara Mohawk desires to challenge any taxes or assessments on property which is subject to the Right-of-Occupancy, Niagara Mohawk reserves the right to conduct such challenges, and Licensee agrees to provide reasonable cooperation in connection therewith. In the event Licensee wishes to challenge any taxes or assessments or increase thereof related to the Right-of Occupancy, Licensee shall request Niagara Mohawk to conduct such challenge. Licensee shall pay all expenses incurred by Niagara Mohawk in connection with conducting such challenges, including but not limited to, reasonable attorney's fees, expert witness fees and disbursements. To the extent any of the above taxes or assessments relating to the Right-of-Occupancy are levied and assessed directly to Licensee, Licensee shall be responsible for any filings, timely payment of and any challenges to such taxes and Niagara Mohawk agrees to provide reasonable cooperation in relation to same.

## 24. INSURANCE

(a)  Required Generally. Licensee and its contractors and subcontractors must, prior to entering upon any Property, including any entry for surveying or the initial installation, and during the term of this Agreement, provide and maintain insurance in the kinds and amounts listed below:

(i)  Workers' Compensation Insurance for statutory obligations imposed by Workers' Compensation or Occupational Disease Laws, including Employer's Liability Insurance with a minimum limit of $500,000. When applicable, coverage shall include The United States Longshoreman's and Harbor Workers' Compensation Act and the Jones Act. Proof of qualification, as a self-insurer may be acceptable in lieu of a Workers' Compensation Policy.

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

(ii)     Comprehensive or Commercial General Liability, Contractual Liability, and Product/Completed Operations Liability Insurance covering all insurable operations required under the provisions of this Agreement and, where applicable, coverage for damage caused by any explosion or collapse with the following minimum limits of liability:

|  |  |
|---|---|
| Bodily Injury Liability | $5,000,000 |
| Property Damage Liability | $5,000,000 |

If a combined single limit is provided, the limit shall not be less than $5,000,000 per occurrence.

(iii)     Automobile Liability covering all owned, non-owned and hired vehicles used in connection with the work or services to be performed under this Agreement with minimum limits of:

Bodily Injury
Property Damage
Combined Single Limit - $1,000,000

(iv)     Property Insurance, including coverage for fire, extended coverage, vandalism and malicious mischief, upon the Licensee's System.

(v)     Such other insurance coverages in such amounts as Niagara Mohawk may, from time to time, reasonably request.

(b)     Other Insurance Requirements.

(i)     Each Party shall be named as an additional insured on the other Party's liability insurance policy(ies) in respect of the activities governed by this Agreement, and, if applicable, each contractor's and subcontractor's policy(ies), and the policy endorsed with a cross liability endorsement. Neither Party shall be required to name subcontractors as additional insureds on any insurance policy.

(ii)     Niagara Mohawk and Licensee hereby mutually release each other (and their respective successors or assigns) from liability and waive all right of recovery against the other for any loss or damage of property resulting from the negligent or other unintentional acts or omissions of the other Party covered by their respective first party property insurance policies for all perils insured thereunder. In the event of such insured loss, neither Party's insurance company shall have a subrogated claim against the other.

(iii)     Neither Licensee nor any contractor or subcontractor shall commence any work under this Agreement, including, without limitation, any installation, Maintenance, repair or modification of any Licensee Facilities, until Niagara Mohawk has been furnished with a completed Certificate(s) of Insurance providing  that Licensee and, if applicable, such contractor or subcontractor has complied with this Section 24, and that the policies shall not be materially changed, diminished or canceled until at least thirty (30) days

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

prior written notice of such change, diminishment or cancellation has been given to Niagara Mohawk. Such certificate of insurance, and any renewals or extensions thereof, shall outline the coverages required and limits on each, which shall be for the account of Licensee, and shall be sent to the following address (or to such other address that Niagara Mohawk may from time to time designate in writing):

> Niagara Mohawk Power Corporation
> Attn.: Risk Management, Bldg. B-3
> 300 Erie Boulevard West
> Syracuse, NY 13202

(iv)     Licensee represents that it has full policy limits available and shall notify Niagara Mohawk's Risk Management Department in writing when coverages required herein have been reduced as a result of claim payments, expenses, or both. If Licensee shall fail to immediately procure and maintain the insurance required hereby or such other insurance as may be reasonably required by Niagara Mohawk, then Niagara Mohawk shall have the right to procure such insurance and to add the cost thereof to any sum due Niagara Mohawk under this Agreement.

(v)     Licensee shall promptly furnish Niagara Mohawk's Risk Management Department with copies of any accident or incident report(s) sent or required to be sent to Licensee insurance carriers covering accidents/incidents occurring in connection with and/or as a result of the performance of Licensee's work under or pursuant to this Agreement.

(vi)     Nothing contained in these insurance requirements is to be construed as limiting the extent of either Party's responsibility for payment of damages resulting from either Party's use of the Property or limiting, diminishing or waiving either Party's obligation to indemnify, defend and save harmless the other as set forth in Section 30 of this Agreement.

(vii)     It is the intent of both parties that the insurance placed in accordance with the provisions of this Section shall be primary insurance and shall protect both Licensee and Niagara Mohawk from losses arising from the performance of their respective obligations under this Agreement.

## 25. PROTECTION AGAINST LIENS ON PROPERTY

Licensee shall not permit any mortgage, pledge, security, interest, lien or encumbrance, including, without limitation, tax liens or encumbrances or mechanic's liens or encumbrances, to be established or remain on any property or portion thereof for a period in excess of thirty (30) consecutive days; provided, however, that the existence of such liens or encumbrances shall not constitute a violation of this provision if payment with respect thereto is not yet due and payable; and provided further that Licensee shall not be required to pay, discharge or remove any such lien or encumbrance so long as Licensee shall, after written notice to Niagara Mohawk, contest the same or the validity thereof in good faith by appropriate proceedings and a proper bond or

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

other security shall have been posted to prevent the divestiture of Niagara Mohawk's interest in any property. Licensee will keep the Property free from any liens arising out of any work performed, materials furnished or obligations incurred by or on behalf of Licensee and shall indemnify, defend and hold harmless Niagara Mohawk from all claims, demands, costs and liabilities, including reasonable attorneys' fees and costs, in connection with or arising out of any such lien or claim of lien. Licensee will cause any such lien imposed on the Property to be released of record by payment or posting of a proper bond within forty-five (45) days after receipt by Licensee of notice of the filing of such lien.

## 26. CONDEMNATION

Provided that Niagara Mohawk's award is not, nor will be, reduced by reason thereof, Licensee may claim and recover from the condemning authority an award for the Licensee Facilities, its moving expenses, business dislocation damages, personal property and fixtures and the unamortized costs of improvements paid for by Licensee.

## 27. ENVIRONMENTAL MATTERS

    (a)    Niagara Mohawk agrees that it will conduct its activities in compliance with applicable Environmental Laws. The Property will not be used by Niagara Mohawk, its employees, agents or contractors to release, store, dispose of, treat or use any Hazardous Substances, except in compliance with applicable Environmental Laws.

    (b)    The Property will not be used by Licensee or their employees, agents or contractors to release, store, dispose of, treat or use any Hazardous Substances, except in compliance with applicable Environmental Laws. Licensee shall indemnify, defend and hold harmless Niagara Mohawk and its officers, employees, agents and contractors from and against any and all claims, suits, actions, causes of action, assessments, losses, penalties, costs, damages and expenses, including, without limitation, reasonable attorneys' fees, sustained or incurred by Niagara Mohawk or its officers, employees, agents or contractors arising out of, in connection with, or as a consequence of Hazardous Substances being released, stored, disposed of, treated or used, or claimed to have been released, stored, disposed of, treated or used, by Licensee or anyone acting under or on behalf of Licensee in, upon or beneath the Property.

    (c)    Neither Party shall place any material on the Property that is recognized by any applicable governmental authority as hazardous or toxic material or waste, except in compliance with applicable Environmental Laws.

    (d)    In the event Licensee discovers, or has knowledge of hazardous or toxic waste areas, whether or not designated as such by the Environmental Protection Agency or any other similar federal, state or local authority, it shall immediately stop work at such areas and notify the designated representative at Niagara Mohawk and any appropriate governmental agency if required by applicable Environmental Laws.

    (e)    In the event any such hazardous or toxic waste areas or any other regulated

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

environmental resources (including, but not limited to, regulated wetlands, protected streams, navigable waters, rare, threatened, endangered or protected species or species habitats, sensitive archaeological sites, etc.) are identified with respect to any particular Property, their location shall be included on the "As-Built Drawings" furnished to Niagara Mohawk in accordance with this Agreement.

## 28. PROPRIETARY INFORMATION

Each Party acknowledges that in the course of the execution, delivery and/or performance of this Agreement it may have access to proprietary information claimed to be unique, secret, commercially sensitive and confidential, and which constitutes the exclusive property or trade secret of the other ("Proprietary Information"). This information may be presented in documents marked with a restrictive notice or otherwise tangibly designated as proprietary or during oral discussions, at which time representatives of the disclosing Party will specify that the information is proprietary and shall subsequently confirm said specification in writing within five days. Each Party agrees to maintain the confidentiality of the Proprietary Information and to use the same degree of care as it uses with regard to its own proprietary information to prevent the disclosure, publication or unauthorized use of the Proprietary Information. Neither Party may duplicate, copy or use Proprietary Information of the other Party other than to the extent necessary to perform its obligations under this Agreement. To the extent either Party utilizes contractors or consultants to perform services in connection with this Agreement, disclosure to such contractors or consultants shall be in accordance with a written non-disclosure agreement consistent with the requirements of this section. Either Party shall be excused from these nondisclosure provisions if the Proprietary Information is (a) subsequently made public by the Party who originally designated such information as Proprietary Information, (b) independently developed by such Party, (c) disclosed pursuant to order by a court or government agency of competent jurisdiction, or (d) disclosed following express, prior written consent given by the other Party. Neither Party shall have the right to obtain any information or document from the other which is not material to the provisions or implementation of this Agreement.

## 29. ASSUMPTION OF RISK

Licensee acknowledges that certain activities to be performed pursuant to or in connection with this Agreement, including, but not limited to, installation, maintenance and modification of Licensee Facilities on Niagara Mohawk Rights of Way, may pose great hazards to persons and/or property. Licensee agrees to take all commercially reasonable safeguards and warn all of its employees, agents and contractors accessing the Right-of-Way of these hazards, as well as the potential consequences associated with exposure to these hazards. Licensee shall provide to all employees, agents and contractors of Licensee accessing the Right-of-Way a current copy of New York State's High Voltage Proximity Act and be advised by Licensee of required clearances to electric conductors. Furthermore, Licensee shall be responsible for any and all injury and damages to persons or property resulting from these hazards or any failure by Licensee to advise its employees, agents or contractors accessing the Right-of-Way of these hazards as required herein or any failure by Licensee, it's employees, agents or contractors to

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

Page 30 of 41

comply with New York State's High Voltage Proximity Act. In addition, Licensee expressly acknowledges that Licensee's System is or may be exposed to many risks beyond the control of Niagara Mohawk, including, but not limited to, wind, rain, sleet, ice, floods, riots and any other Force Majeure Event. Except as expressly provided in this Agreement, Licensee shall assume all risk of loss that may arise in connection with these hazards.

## 30. INDEMNIFICATION

(a)     By Niagara Mohawk. Niagara Mohawk agrees to protect, indemnify, defend and hold harmless Licensee, its partners, officers, employees, agents, successors, assigns and independent contractors from and against any and all losses, damages, liabilities, costs, suits, charges, causes of action, claims (including reasonable claims of Third Party land owners) and expenses (including reasonable attorneys' fees) arising out of any damages to the Licensee's Facilities (including environmental damage), or injury to or death of any person, caused by or attributable to any negligent act or omission of Niagara Mohawk, its directors, officers, employees, agents, successors, assigns or independent contractors, or the willful misconduct of any thereof, except to the extent attributable to the negligent or intentional act or omission of Licensee, its partners, officers, employees, agents, successors, assigns or independent contractors. This indemnification shall also apply to any and all fines, levies, penalties, citations, assessments and fees from any local, state or federal agency, board, court or other governmental authority imposed as a result of any actual violation by Niagara Mohawk, its directors, officers, employees, agents, successors, assigns or independent contractors of any laws, rules or regulations of such authorities or agencies, except to the extent attributable to the negligent or intentional act or omission of Licensee, its partners, officers, employees, agents, successors, assigns or independent contractors. The indemnification requirements contained herein shall be subject to the waiver of consequential damages contained in Section 31.

(b)     By Licensee. Licensee agrees to protect, indemnify, defend and hold harmless Niagara Mohawk, its directors, officers, employees, agents, successors, assigns and independent contractors from and against any and all losses, damages, liabilities, costs, suits, charges, causes of action, claims (including reasonable claims of Third Party land owners) and expenses (including reasonable attorneys' fees) arising out of any damages to Niagara Mohawk's Property (including environmental damage), or injury to or death of any person, caused by or attributable to any negligent act or omission of Licensee, its partners, officers, employees, agents, successors, assigns or independent contractors, or the willful misconduct of any thereof, or in the performance or breach of any of Licensee's obligations under this Agreement, except to the extent attributable solely to the negligent or intentional act or omission of Niagara Mohawk, its directors, officers, employees, agents, successors, assigns or independent contractors. Licensee shall indemnify, defend and hold harmless Niagara Mohawk and its employees, agents and contractors from and against any and all claims, suits, actions, causes of action, assessments, losses, penalties, costs, damages and expenses, including, without limitation, reasonable attorneys' fees, sustained or incurred by Niagara Mohawk or its employees, agents or contractors arising out of or in connection with placement of, use of, or right to use Licensee's System on the Right-of-Way. This indemnification shall also apply to any and all fines, levies, penalties,

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding. Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

citations, assessments and fees from any local, state or federal agency, board, court or other governmental authority imposed as a result of any alleged or actual violation by Licensee, its partners, directors, employees, agents, successors, assigns or independent contractors of any laws, rules or regulations of such authorities or agencies, except to the extent attributable solely to the negligent or intentional act or omission of Niagara Mohawk, its directors, officers, employees, agents, successors, assigns or independent contractors.   The indemnification requirements contained herein shall be subject to the waiver of consequential damages contained in Section 31 of this Agreement.

(c)    Indemnification Procedures; Costs.   Each Party shall take prompt action to defend and indemnify the other Party against claims, actual or threatened, but in no event later than the applicable deadline to answer the service of a summons, complaint, petition or other Party alleging any damage, personal injury, liability, or expenses attributed in any way to the work, acts, fault, negligence, equipment, facilities, personnel, or property, of the Party, its agents and employees.   Each Party shall defend any such claim or threatened claim, including as applicable, engagement of legal counsel, to respond to, defend, settle, or compromise any claim or threatened claim, and may be required to testify, either in court or at a hearing or disposition in connection with the matters covered by this Agreement.   Furthermore, each Party understands and agrees to be responsible for any all costs and expenses, including reasonable attorneys' fees, incurred by the other Party to enforce this indemnification provision, if and to the extent such Party, which should have indemnified the other, failed to do so.   The obligations set forth herein shall survive completion of the work and termination of this Agreement for any reason.

## 31. WAIVER OF CERTAIN DAMAGES

Regardless of any other provision of this Agreement, and with the exception of any Third Party bodily injury or property damage obligations, under no circumstances will either Party be liable, whether in contract, tort (including negligence and strict liability), warranty, or any other legal theory, to the other Party for any incidental, indirect, special or consequential damages whatsoever, such as, but not limited to, loss of profits or revenue, cost of capital or of substitute use or performance, interruptions to operations or for claims for damages by or to either Party's customers.   Furthermore, Niagara Mohawk will not be liable for the accuracy or integrity of the transmission signal and/or the accuracy of any data or message communicated over Licensee's System.

## 32. BREACH

(a)    Breach Defined.   In addition to rights of termination provided to Niagara Mohawk under other provisions of this Agreement, Niagara Mohawk shall, subject to applicable cure periods, if any, have the right to terminate any rights granted to Licensee under or pursuant to this Agreement where:

(i)    Licensee's Facilities are maintained or used in violation of any applicable law, statute, order, rule or regulation, or in aid of any unlawful act or undertaking, or

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

in a manner that endangers the immediate health and/or safety of workers, the public or Niagara Mohawk's facilities, subject to five (5) days to cure;

(ii)     Licensee ceases to have all necessary and required consents, approvals and authority to construct, Maintain and operate its Facilities on public or private property at a location covered by this Agreement, subject to thirty (30) days to cure;

(iii)    Any lien or encumbrance shall exist on any Niagara Mohawk Property in violation of Section 25 of this Agreement.

(iv)    Except as otherwise stated herein, Licensee fails to comply with any of the terms or provisions of this Agreement or defaults in any of its obligations thereunder, after Licensee is given thirty (30) days to cure;

(v)     Licensee's Facilities occupy any of Niagara Mohawk's facilities without having first been issued an authorization by Niagara Mohawk for such occupancy;

(vi)    Licensee ceases to offer its services for a period of six (6) consecutive months;

(vii)   Licensee's System is used by Third Parties without the prior written consent of Niagara Mohawk, provided that such use shall not be construed as including Permitted Third Party Uses;

(viii)  Licensee sublets or apportions part of the Right of Occupancy, other than subleasing or sublicensing of dark fiber strands, to a Third Party without the prior written consent of Niagara Mohawk;

(ix)    A governmental agency and/or regulating authority requires termination of this Agreement or a Route Segment, subject to thirty (30) days to cure;

(x)     Licensee and/or its agents or contractors shall fail to maintain the insurance coverages required pursuant to this Agreement, or Licensee's insurance carrier shall at any time notify Niagara Mohawk that the policy or policies of insurance, as required in Section 24 of this Agreement, will be or have been canceled, terminated, suspended or any coverages thereof have been reduced or diminished;

(xi)    Licensee shall fail to pay any sum due or to deposit any sum required under this Agreement, within thirty (30) days following the issuance by Niagara Mohawk of written notice requiring such payment or deposit;

(xii)   Any authorization, consent, approval or permit which may be required by any governmental or private authority for the construction, operation and/or Maintenance of Licensee's System is denied, revoked or canceled, subject to thirty (30) days to cure;

**Confidential and Proprietary - Niagara Mohawk Power Corporation**
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

(xiii)     Licensee shall admit, in writing, its inability to pay its debts when due; or Licensee makes a general assignment for the benefit of creditors; or the institution of any proceeding, whether voluntary or involuntary, seeking to adjudicate Licensee bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of Licensee or Licensee's debt under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking appointment of a receiver trustee, or other similar official for Licensee or for any substantial part of Licensee's property; or Licensee shall take any action to authorize any of the actions set forth above; or

(xiv)     the Public Service Commission of the State of New York or any other applicable public or governmental authority having jurisdiction makes a determination that operation of Licensee's System would classify Niagara Mohawk as a telephone corporation or common carrier for purposes of Commission regulation under the Public Service Law.

(b)     Remedies.  In the event of a Breach and upon and from the expiration of any applicable cure period, Niagara Mohawk may, in its sole discretion, terminate this Agreement and have no further obligations or liability hereunder.  Termination of this Agreement as above provided shall not relieve Licensee of its obligations hereunder, including, without limitation, the obligation to pay Niagara Mohawk any amounts due, owing and unpaid by Licensee.   Niagara Mohawk shall also have the right to pursue any and all rights it may have against Licensee now or hereafter under the law, including without limitation, the right to seek (i) injunctive relief to prevent Licensee from continuing to Breach its obligations under this Agreement, and (ii) reasonable attorney and other expert and Third Party fees of Niagara Mohawk.   In addition, Niagara Mohawk shall also have the right to any direct damages incurred as a result of such breach.

(c)     Cure Period.  Cure periods set forth herein, if any, shall commence on the date on which Licensee first discovers such Breach or has been notified of the Breach (whether such notification is given or provided by Niagara Mohawk or a Third Party), whichever shall first occur.

## 33. ASSIGNMENT AND TRANSFER

(a)     Assignment By Niagara Mohawk.  Niagara Mohawk shall have the right to freely assign its entire interest under this Agreement without the consent of Licensee.  Niagara Mohawk shall give Licensee written notice not later than sixty (60) days following the effective date of any such assignment.  From and after the effective date of any such assignment, Niagara Mohawk shall be relieved of all future performance, liabilities and obligations under this Agreement.

(b)     Assignment By Licensee.  Licensee shall have the right to assign its entire interest under this Agreement to an entity owned or controlled by Licensee, or to any successor to Licensee by purchase, merger, consolidation or reorganization, or to an affiliate that has the power to direct or cause the direction of management and policies of Licensee, or to an affiliate

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

entity with which Licensee, or the controlling owners of Licensee, have the power to direct or cause the direction of management and policies of such affiliate (hereafter collectively referred to as a "Licensee Permitted Transfer") without the consent of Niagara Mohawk; provided that (a) Licensee is not then in default under this Agreement; (b) if such proposed assignee is a successor to Licensee by purchase, said proposed assignee shall acquire all or substantially all of Licensee's stock or assets or, if such proposed assignee is a successor to Licensee by merger, consolidation or reorganization, the continuing or surviving corporation shall own all or substantially all of the assets of Licensee; (c) such proposed assignee maintains at the time of assignment, as demonstrated by current financial statements provided to Niagara Mohawk, a financial position reasonably demonstrating the ability of such assignee to meet and perform the obligations of Licensee under this Agreement; and (d) such assignee assumes all of Licensee's obligations hereunder.  Licensee shall give Niagara Mohawk written notice not later than sixty (60) days following the effective date of a Licensee Permitted Transfer.  As used herein, the term "owned or controlled" shall mean ownership of more than fifty percent (50%) of the equity interest or more than fifty percent (50%) of the voting rights of the applicable entity.  Any assignment or transfer by Licensee of any of its rights or obligations under this Agreement, other than a Licensee Permitted Transfer, shall be void without Niagara Mohawk's prior written consent.

## 34.  NOTICES

(a)     Notices Generally.  All notices, requests, demands and other communications hereunder will be in writing and will be deemed given if personally delivered, sent by facsimile or by an overnight courier provided proof of service is furnished therefor, or if mailed, certified mail, return receipt requested, to the parties at the following addresses:

If to Niagara Mohawk:

Niagara Mohawk Power Corporation
300 Erie Boulevard West
Syracuse, NY 13202
Attn:  Manager – Telecommunication Opportunities
(315) 428-6747/(315) 460-9115 fax
with a copy to:

Niagara Mohawk Power Corporation
300 Erie Boulevard West
Syracuse, NY 13202
Attn: Law Dept.
(315) 428-3310/(315) 460-8031 fax

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

Page 35 of 41

If to Licensee:

> Manager - Contracts
> 4355 Innslake Drive
> Glen Allen, VA  23060

With a copy to:

> General Counsel
> Dominion Resources Services, Inc., Law Dept. – PH-1
> P. O. Box 26532
> Richmond, VA 23261-6532

(b)     Manner of Delivery.   Each notice, demand, request, report, approval or communication which shall be mailed in the manner described above, or delivered by hand or an insured overnight courier, shall be deemed sufficiently given, served, sent or received for all purposes at such time as it is delivered to the addressee, with the return receipt or the delivery receipt being deemed conclusive evidence of such delivery, or at such time as delivery is refused by the addressee upon presentation.

(c)     Damage or Emergency Access Notification.  In the event that the Licensee's Facilities are damaged or emergency access is required for any reason, the party discovering such damage or requiring such access shall notify the other party by telephone at:

for Niagara Mohawk    (315) 460-2421 (Niagara Mohawk Central Regional Control)

for Licensee

These are 24-hour, 7-day per week emergency notification numbers.  Calls shall be directed to the Supervisor on Duty, and the caller should be able to provide the following information:

1.     Name of company making report;
2.     Location reporting problem;
3.     Name of contact person reporting problem;
4.     Telephone number to call back with progress report;
5.     Description of the problem in as much detail as possible;
6.     Time and date the problem occurred or began; and
7.     If appropriate, a statement that **"This is an emergency"** and that a problem presents a jeopardy situation to the physical plant of Niagara Mohawk, Licensee, or others as the case may be.

## 35. DISPUTE RESOLUTION

(a)     Dispute Resolution Generally.   It is the intent of the Parties that disputes

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

which may arise between them, or between employees of each, be resolved as quickly as possible and may, in certain instances, involve decisions made on the spot.   When such resolution is not possible, and depending upon the nature of the dispute, the Parties agree to seek to resolve such disputes in the manner set forth below.

(b)   Mediation.  Failing resolution of a dispute amicably by mutual discussion between the Parties or their designated representatives, any controversy, claim or dispute arising under or relating to this Agreement, including the existence, validity, interpretation, performance, termination or breach thereof, may be submitted by mutual agreement of the Parties to non-binding mediation under the commercial mediation rules of the American Arbitration Association ("AAA").  Each Party shall bear its own expenses, but the Parties shall share equally the fees and expenses of the mediator.  The mediation shall be held in Syracuse, New York, unless otherwise mutually agreed upon between the Parties.  The parties hereby acknowledge and agree that such mediation shall be deemed to be in the nature of settlement discussions and that neither the fact that such discussions took place, nor any statement or conduct of any participant in such discussions shall be admissible into evidence in any subsequent litigation or in any arbitration or other dispute resolution proceeding involving the parties.  It is further understood and agreed that any disclosure in any form, including oral, by any person participating in such mediation shall not operate as a waiver of any privilege, including work product or attorney-client privilege, applicable to the subject matter thereof.

## 36. WAIVER OF JURY TRIAL

TO THE FULLEST EXTENT PERMITTED BY LAW, LICENSEE HEREBY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING BROUGHT BY NIAGARA MOHAWK INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND/OR THE TRANSACTIONS CONTEMPLATED HEREBY.  TO THE FULLEST EXTENT PERMITTED BY LAW, LICENSEE HEREBY IRREVOCABLY WAIVES IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY NIAGARA MOHAWK UNDER THIS AGREEMENT, ANY AND EVERY RIGHT IT MAY HAVE TO, (I) INTERPOSE ANY COUNTERCLAIM THEREIN AND (II) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING.   NOTHING HEREIN CONTAINED SHALL PREVENT OR PROHIBIT LICENSEE FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST NIAGARA MOHAWK WITH RESPECT TO ANY ASSERTED CLAIM.

## 37. MISCELLANEOUS

(a)   Compliance with Laws.  Each Party shall comply with, and shall cause its officers, employees, agents, representatives and independent contractors to comply with, all applicable laws, statutes, orders, rules and regulations of local, state and federal agencies from time to time in effect.

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

(b)     Integration.  This Agreement, any addendum and the exhibits thereto shall constitute the entire agreement between the Parties and shall supersede all offers, negotiations and other agreements and shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.  There are no representations or understandings of any kind not set forth herein or therein.  Any amendments or modifications to this Agreement or any Supplemental Agreement must be in writing and executed by both Parties.

(c)     Section Headings.  The article and section headings in this Agreement and the Table of Contents hereof are for convenience of reference only and shall neither be deemed to be a part of this Agreement nor modify, define, expand or limit any of the terms or provisions hereof.  All references to numbered Articles or Sections, unless otherwise indicated, are to Articles or Sections of this Agreement.  Words and definitions in the singular shall be read and construed as though in the plural and vice versa, and words in the masculine, neuter or feminine gender shall also be read and construed as though in either of the other genders.

(d)     Waiver.  Any waiver by either Party at any time of any of its rights as to anything contained herein shall not be deemed to be a waiver of the same or similar right at a subsequent time.  The failure of any Party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of any original violation.  No course of dealing between Parties or any delay on the part of a Party to exercise any right it may have under this Agreement will operate as a waiver of any of the rights provided hereunder or by law or equity, nor will any waiver of any prior default operate as a waiver of any subsequent default, and no express waiver shall affect any term or condition other than the one specified in such waiver, and the express waiver shall apply only for the time and manner specifically stated.

(e)     Cumulative Remedies.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any Party shall not preclude or waive its right to sue on any or all other remedies.  Said rights and remedies are given in addition to any other rights such Party may have by law, statute, ordinance or otherwise, except as such rights and remedies are expressly limited in this Agreement.

(f)     Severability.  Any provision of this Agreement which is invalid, illegal or unenforceable in any manner in any applicable jurisdiction shall be, as to such jurisdiction, ineffective to the extent of such invalidity, illegality or unenforceability without in any way affecting the validity, legality or enforceability of the remaining provisions hereof, and any such invalidity, illegality or unenforceability in any one jurisdiction shall not invalidate or in any way affect the validity, legality or enforceability of such provision in any other jurisdiction.

(g)     Non-Merger with Fee Estate.  There shall be no merger of this Agreement or any Right-of-Occupancy hereby granted with the fee estate in a right-of-way by reason of the fact that this Agreement, and the Right-of-Occupancy created by this Agreement, or any interest in this Agreement or in any such Right-of-Occupancy, may be held, directly or indirectly, by or for the account of any person who shall own the fee estate in a right-of-way or any interest in

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

such fee estate, and no such merger shall occur unless and until all persons having an interest in this Agreement, and the Right-of-Occupancy created by this Agreement, shall join in a written instrument expressly affecting such merger and shall duly record the same.

(h)     Fitness for Duty.  Licensee's officers, employees, agents and contractors shall be fit for duty at all times during their performance of any activities pursuant to this Agreement, and shall not be under the influence of alcohol or drugs.  Such officers, employees, agents and contractors shall not bring, use, distribute, sell or possess alcoholic beverages or illegal drugs during the performance of any activities on Niagara Mohawk Property.  Licensee shall not assign any individual who is in violation of this policy to perform any activities pursuant to this Agreement.  If Licensee discovers any individual is in violation of these requirements, it shall immediately remove any such person from the performance of activities on Niagara Mohawk Property.  Violation of these requirements by such officers, employees, agents or contractors shall result in denial of access of that individual(s) to Niagara Mohawk Property, facilities and equipment and, in the case of possession, use or sale of illegal drugs, shall be reported to Niagara Mohawk's Security Department immediately.  Niagara Mohawk, at it's sole discretion, shall have the right to remove any officer, employee, agent or contractor of Licensee or its Affiliates for cause and with notification provided to Licensee or its Affiliates upon such removal.

(i)     Third Party Beneficiaries.  By entering into this Agreement, the Parties do not intend to create any express or implied Third Party beneficiaries.

(j)     Priority of Agreements.  Licensee's use or occupancy of Niagara Mohawk electric distribution poles, electric transmission structures and underground electric Conduit system must be authorized under and shall be expressly subject to the terms and conditions of Niagara Mohawk's specific agreements governing such use.  In the event of any conflict between the terms and conditions of this Agreement and the agreements authorizing use or occupancy of Niagara Mohawk electric distribution poles, electric transmission structures and underground electric conduit system, the terms of the agreement authorizing such use shall govern.

(k)     Independent Contractor.  Niagara Mohawk reserves no control whatsoever over the employment, discharge, compensation of or services rendered by Licensee's officers, employees, agents, representatives or contractors, and it is the intention of the Parties that Licensee shall be and remain, an independent contractor and that nothing herein shall be construed inconsistently with Licensee's status as an independent contractor or as creating or implying any partnership or joint venture between Niagara Mohawk and Licensee.

(l)     Incorporation of Exhibits.  The Exhibits referenced in and attached to this Agreement shall be deemed an integral part hereof to the same extent as if written at length herein.

(m)     Counterparts.  To facilitate execution, this Agreement may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures of or on behalf of each Party appear on each counterpart; but it shall be sufficient that the signature of or on behalf of each Party appear on one or more of the counterparts.  All counterparts shall

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

Page 39 of 41

collectively constitute a single agreement.   It shall not be necessary in any proof of this Agreement to produce or account for more than the number of counterparts containing the respective signatures of or on behalf of all of the Parties.

(n)   Applicable Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York, and questions as to its validity and interpretation, including any questions regarding performance or default hereunder, shall be construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles.  Any action at law, suit in equity or judicial proceeding initiated by either party arising out of this Agreement shall be instituted only in the courts of the State of New York.

## 38. NEW YORK PUBLIC SERVICE COMMISSION APPROVAL

The Parties acknowledge that this Agreement and any amendments thereto may be filed with and may require the approval of the New York Public Service Commission ("PSC") pursuant to the provisions of Public Service Law Sections 70 and/or 119-a, or that Niagara Mohawk may seek approval of same from the PSC at Licensee's sole cost and expense.  If the PSC issues any rule, order or determination that directly or indirectly prohibits or prevents performance under this Agreement or otherwise makes such performance illegal or impossible, or takes any action or issues any rule, order or determination that directly or indirectly effects a material adverse change in any substantive provision of this Agreement, in the terms of performance or the rights or obligations of either Party, then either Party may (i) proceed with the Agreement so changed, (ii) seek to renegotiate the affected terms of the Agreement by providing written notice to the other Party of its desire to do so or (iii) terminate the Agreement by providing sixty (60) days' prior written notice; provided that, if such action or determination is rescinded prior to the effectiveness of such termination notice, the termination notice will be ineffective.

[the remainder of this page intentionally left blank]

Confidential and Proprietary - Niagara Mohawk Power Corporation
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be duly executed as of the day and year first above written.

NIAGARA MOHAWK POWER CORP.

By: _____

      CLEMENT E. NADEAU
      SR. VICE PRESIDENT - OPERATIONS
Title: _____

Date: _____ 3/22/02 _____


DOMINION TELECOM, INC.

By: _____

      CHARLES VASSALLO
      Vice President-Strategy,
      Finance & Support Services
Title: _____

Date: _____ March 19, 2002 _____

**Confidential and Proprietary - Niagara Mohawk Power Corporation**
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original
agreements are mutually signed and exchanged between the parties.

Page 41 of 41

# EXHIBIT I
## APPLICATION FOR RIGHT OF OCCUPANCY

Page 1 of 2
Date:_____

(1)   **Identification of Entity Applying for Right of Occupancy (the "Applicant"):**

Name:_____

Address:        _____

Contact Person:        _____

Title:        _____

Telephone:        _____

(2)   **Description of Business**
Please describe in a separate exhibit the nature of the Applicant's business.
Also provide a copy of the Applicant's organization papers that establishes the Applicant
as a legally valid business entity (such as Articles of Incorporation).

(3)   Description of Project
Please provide a detailed description in separate exhibits of the Right of Occupancy
sought by the Applicant.  This description, at a minimum, must include:

(a)      Route location(s). (including maps and diagrams)

(b)      The nature of the proposed Right of Occupancy.

(c)      Anticipated or requested installation schedule for each route.

(d)      If there is more than one route, an identification of the priorities and timing of
each route.

(e)      The manner in which the Applicant proposes or expects to construct or install the
proposed facilities, including identification of the entity responsible for
construction and installation.

(f)      The manner in which the Applicant proposes to Maintain the facilities, including
identification of the entity responsible for Maintenance.

(g)      If the Applicant anticipates that an entity other than the Applicant will hold title to
the facilities, please so specify and explain.

**Confidential and Proprietary - Niagara Mohawk Power Corporation**
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original
agreements are mutually signed and exchanged between the parties.

(4)   Contingencies

If there are any contingencies that affect whether or not the Applicant would proceed with the project, please describe all such contingencies in a separate exhibit.

I certify that I am authorized to execute this application on behalf of the Applicant. I also certify that, to the best of my knowledge and belief, all of the statements and representations made in this Application (including attached Exhibits) are true and accurate.  I also have read and acknowledge the Additional Information printed below.

AUTHORIZED SIGNATURE

APPLICANT: _____

By: _____

Print Name: _____

Print Title: _____

Additional Information for the Applicant

Please note that Niagara Mohawk will need to perform informal engineering studies to determine work scope and Niagara Mohawk's estimated costs associated with the Applicant's proposed Right of Occupancy.  Such engineering studies will not be performed until Niagara Mohawk has made satisfactory arrangements for reimbursement of the cost of the studies.   In addition, Niagara Mohawk makes no representation, warranty or guarantee that the proposed Right of Occupancy can be provided. In addition, each proposed project may require a legal review, at the Applicant's sole cost, regarding issues of applicable law relating to the use of Right-of-Way for the proposed project(s), except with respect to property that Niagara Mohawk has determined it owns in fee.

**Confidential and Proprietary - Niagara Mohawk Power Corporation**
This document is not legally binding.  Niagara Mohawk will not be bound under any contract until formal, duplicate original agreements are mutually signed and exchanged between the parties.

## EXHIBIT II

## NIAGARA MOHAWK POWER CORPORATION

## TERMS AND CONDITIONS FOR THE
## SUPPLY OF GOODS, INSTALLATION AND MAINTENANCE SERVICES

1.  **DEFINITIONS.**

    "Licensee" means the person or entity purchasing Goods and Services under this Contract.

    "Contract" means these Terms and Conditions, Niagara Mohawk's Proposal, the Licensee's Purchase Order or other similar document, and any amendments to the Contract. In the event of any conflict among Contract documents, these Terms and Conditions shall govern.

    "Goods" means the equipment, materials, components, or other personal property purchased by Licensee under this Contract.

    "Niagara Mohawk" means Niagara Mohawk Power Corporation.

    "Services" means all installation, maintenance, and related services and any submittals purchased by Licensee under this Contract.

2.  **DELIVERY, TITLE AND RISK OF LOSS.** Delivery of Goods shall be as specified in the Contract. Title and risk of loss to Goods shall pass to Licensee upon delivery, except that Niagara Mohawk shall bear risk of loss for Goods under the exclusive control of Niagara Mohawk in performing Services under this Contract. Title and risk of loss to Services shall pass to Licensee as the Services are completed. For Services performed on Licensee's equipment, facilities or structures, Niagara Mohawk shall bear risk of loss for such equipment, facilities or structures, but only while such equipment, facilities, or structures are under the exclusive control of Niagara Mohawk in performing the Services. Except for the time that the equipment, facilities and/or structures are under the exclusive control of Niagara Mohawk, Licensee waives any and all rights of subrogation against Niagara Mohawk and will indemnify and hold harmless Niagara Mohawk against any and all subrogation claims arising therefrom.

3.  **CONTRACT PRICE, TAXES, AND PAYMENT.** The price for the Goods and Services shall be as set forth in the Contract ("Contract Price"), and shall include all applicable taxes. Unless otherwise agreed to in the Contract, payment of the Contract Price shall be due in full within thirty (30) days of Niagara Mohawk's issuance of an invoice. Payment shall be transmitted as specified in the invoice. A continuing late payment charge of 1.5% per month will be applied on any late payments. In addition, Niagara Mohawk will have available to it all rights and remedies set forth in its applicable tariff in the event payment shall not be made when due.

1

Confidential and Proprietary
Rev. 5/12/99

4.   **SCHEDULE, DELAYS, AND FORCE MAJEURE.**  Niagara Mohawk shall provide Goods and Services in accordance with the schedule set forth in the Contract ("Contract Schedule").  If Niagara Mohawk's performance of the Contract is delayed by Licensee, an equitable adjustment shall be made for any increase in the cost and/or time of performance caused by the delay.  Any delays in or failure of performance by Licensee or Niagara Mohawk, other than payment of monies, shall not constitute default and shall be excused hereunder, if and to the extent such delays or failures of performance are both (1) caused by occurrences beyond the reasonable control of Licensee or Niagara Mohawk, including, but not limited to, acts of God, compliance with any order or request of any governmental or judicial authority, compliance with Niagara Mohawk's public service obligations, storms, fires, inclement weather (as provided in Niagara Mohawk's internal policies or procedures), floods, riots or strikes or other concerted acts of workers, and accidents; and (2) events which, by the exercise of reasonable diligence, Licensee or Niagara Mohawk are unable to prevent.

5.   **WORK SCOPE REQUIREMENTS.**  Licensee shall provide full information regarding requirements for the Goods and Services, including constraints, space requirements and relationships, special equipment, systems, site requirements, underground or hidden facilities and structures, and all applicable drawings and specifications. Licensee shall also provide Niagara Mohawk with reasonable access to the work site, including any plowing of access roadways and staging areas, and, where feasible, shall provide areas near the work site for any Niagara Mohawk vehicles and work force parking.  Unless the Contract provides otherwise, all temporary facilities and utilities necessary to accomplish the Services shall be provided by Licensee. Licensee shall provide transportation, handling, removal and disposal of any chemicals, materials or waste that may be considered hazardous materials requiring special handling or disposal.  Other Licensee responsibilities shall be as specified in the Contract.  Niagara Mohawk assumes that all information provided by Licensee is accurate and complete and is relying on such information.   To the extent Niagara Mohawk obtains actual knowledge of facts or conditions regarding the Goods or Services that are additional to or different from those indicated in Licensee-supplied information, or that are previously unknown to Licensee, Niagara Mohawk shall notify Licensee.  If, as a result, any changes in the Goods or Services are required that will result in an increase or decrease in the cost or time of performance under the Contract, the Contract Price and Contract Schedule and other affected provisions of the Contract shall be equitably adjusted.

6.   **CHANGES AND EXTRAS.**  Licensee may request changes in the Goods or Services in writing. If any such changes will result in an increase or decrease in the cost or time of performance under the Contract, the Contract Price and Contract Schedule and other affected provisions of the Contract shall be equitably adjusted.  Niagara Mohawk may make changes in the Goods or Services with the prior written approval of Licensee, at no change in the Contract Price or Contract Schedule, except as provided in (5) and (7).

7.   **GOVERNMENTAL REQUIREMENTS.**  Changes in the Goods or Services may be necessary in order to meet the requirements of governmental authorities, laws and codes.

2

Confidential and Proprietary
Rev. 5/12/99

After Licensee's approval, Niagara Mohawk will make changes in the Goods or Services as are necessary to conform to such requirements. If any such changes will result in an increase or decrease in the cost or time of performance under the Contract, the Contract Price and Contract Schedule and other affected provisions of the Contract shall be equitably adjusted.

8.    **PATENTS.** Niagara Mohawk makes no warranty that the manufacture, sale or use of the Goods does not infringe any patent or other proprietary right of any entity. In the event that the manufacture, sale or use of any Goods is held or alleged to constitute an infringement of any patent or other proprietary right of any entity, Niagara Mohawk agrees, as its sole obligation, to assign to Licensee any rights Niagara Mohawk may have against Niagara Mohawk's supplier with respect to such infringement or alleged infringement.

9.    **CONFIDENTIALITY.** Any drawings, specifications, and other documents prepared or used by Niagara Mohawk in connection with this Contract are the proprietary property of Niagara Mohawk, and, if required in the Contract, are provided to Licensee solely for its internal use. If information supplied by either party to the other is confidential or proprietary to the transmitting party, the receiving party shall hold such information in confidence; use it only for its intended purpose and solely in connection with Goods and/or Services supplied under this Contract; and shall not otherwise disclose or use it. These restrictions will not apply to information in the public domain at the time of receipt, or independently developed by the recipient, or required by a governmental or judicial authority to be disclosed, in which event the recipient shall give the other party advance notice of the disclosure and shall attempt to secure confidential treatment of the information by the subject authority.

10.   **GUARANTEES.** The Goods shall be sold and purchased "as is." **NIAGARA MOHAWK MAKES NO WARRANTIES WHATSOEVER, WHETHER STATUTORY, WRITTEN, ORAL, OR IMPLIED (INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE FOR A PARTICULAR PURPOSE) WITH RESPECT TO THE GOODS.** Niagara Mohawk hereby assigns to Licensee any Niagara Mohawk rights under any supplier warranties with respect to the Goods. Licensee hereby releases Niagara Mohawk from any liability related to the Goods, except for damages to the Goods directly caused by Services in nonconformance with the Services warranty, as provided hereafter. In connection with Services only, Niagara Mohawk warrants that such work will be performed in conformance with generally accepted professional standards prevailing at the time of Niagara Mohawk's performance in the applicable industry. If the Services do not conform to this warranty, Niagara Mohawk will, at its cost and at a time mutually convenient to Niagara Mohawk and Licensee, reperform such nonconforming Services, and repair or replace any defects in the Goods solely caused by the nonconforming Services. Niagara Mohawk's obligation under this Services warranty will expire one (1) year after the Services which give rise to the claim are completed. This warranty will not apply where the failure to meet the warranty is the result of acts or omissions of persons other than Niagara Mohawk, or of accidents not caused by Niagara Mohawk. **THIS EXPRESS**

3

WARRANTY IS EXCLUSIVE, AND NO OTHER WARRANTIES OF ANY KIND, WHETHER STATUTORY, WRITTEN, ORAL, OR IMPLIED (INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE FOR A PARTICULAR PURPOSE), SHALL APPLY TO THE SERVICES. THESE PROVISIONS SHALL GOVERN OVER ANY CONTRARY VERBAL STATEMENTS OR LANGUAGE APPEARING IN ANY NIAGARA MOHAWK OR CONTRACT DOCUMENTS.

11. **INSURANCE.** From the commencement of the Contract through completion, Niagara Mohawk shall provide and maintain, at its own expense, insurance policies issued by reputable insurance companies that meet or exceed the following requirements:

> **Workers' Compensation and Employers Liability Insurance**, as required by the State of New York. Coverage will include the U.S. Longshoremen's and Harbor Workers Compensation Act and the Jones Act

> **Public Liability**, including Contractual Liability and Products/Completed Operations coverage, covering all operations to be performed under this Contract, with minimum limits of:

> > Bodily Injury        -   $1,000,000 per occurrence
> > Property Damage    -   $1,000,000 per occurrence

> **Automobile Liability.** Niagara Mohawk is a qualified self-insurer by the State of New York

If requested, Niagara Mohawk will provide evidence for these specified coverages. Such evidence will include that at least thirty (30) days prior written notice shall be given to Licensee in the event of any cancellation or diminution of coverage. If Niagara Mohawk uses subcontractors in connection with the Contract, Niagara Mohawk shall require them to provide the same Workers' Compensation and Employers Liability and Public Liability coverages set forth above. In lieu of automobile self-insurance, subcontractors shall be required to maintain automobile liability insurance covering all owned, non-owned, and hired vehicles used in connection with the Services, with a combined single limit of at least $500,0000.

12. **INDEMNIFICATION.** Niagara Mohawk shall defend, indemnify, and hold harmless Licensee, its agents and employees, from and against any loss, damage, liability, cost, suit, charge, cause of action, claim, and expense, arising out of any damage to property (including environmental damage) or injury to or death of any person directly caused by the negligence of Niagara Mohawk while performing Services. In the event that the injury or damage is caused by the joint or concurrent negligence of Niagara Mohawk and Licensee, the loss shall be borne by Niagara Mohawk and Licensee proportionately to their degree of negligence. Niagara Mohawk's obligations hereunder shall in no event apply when such damage or injury results from a defect in Goods not caused by Niagara Mohawk's Services.

4

Confidential and Proprietary
Rev. 5/12/99

13. **LIMITATION OF LIABILITY.** Except in the event of bodily injury or death, Niagara Mohawk's total cumulative liability to Licensee for all claims of any kind, whether based upon contract, tort (including negligence and strict liability), or otherwise, for any loss, injury, or damage connected with, or resulting from this Contract or the items provided hereunder, shall in no case exceed the Contract Price. Except as this Contract may expressly provide, in no event, whether as a result of breach of contract, tort (including negligence and strict liability), or otherwise shall Niagara Mohawk be liable to Licensee for any and all special, indirect, incidental, penal, punitive or consequential damages of any nature, including delays, lost profits, business interruptions, claims of suppliers and customers. The provisions of this Section shall apply notwithstanding any other provisions of the Contract, and shall survive, termination, cancellation, or completion of the Contract.

14. **TERMINATION.** Unless otherwise agreed to in the Contract, this Contract may be terminated by either party upon not less than ten (10) days written notice to the other party. Such termination shall be effective on the date set forth in the notice. In such event, neither party shall be entitled to incidental or consequential damages for termination, including loss of prospective profits. No amount shall be paid by either party for termination costs, including demobilization and other direct and indirect costs. Within thirty (30) days of termination, Niagara Mohawk will return any sums paid, less expenses incurred and amounts due and owing for that portion of the Contract work scope performed to the date of termination. In the event these withheld sums are insufficient to cover the expenses and amounts, or no payments have yet been made under this Contract, Licensee shall remit the balance due within thirty (30) days after receipt of written notice by Niagara Mohawk.

15. **ASSIGNMENT.** This Contract shall not be assigned or subcontracted by either party without the other party's prior written consent, which shall not be unreasonably withheld. Notwithstanding the foregoing, Niagara Mohawk has the right to assign this Contract to its subsidiary OPINEC Energy Corporation, or any subsidiary thereof, including Niagara Mohawk Energy, or any subsidiary's subsidiary.

16. **THIRD-PARTY BENEFICIARY.** The parties have no intent, and do not create, any third-party rights or interest in this Contract, or in the Goods or Services.

17. **AMENDMENT.** This Contract shall not be superseded or modified, except in writing signed by the parties.

18. **NOTICES.** Each party shall designate in the Contract the name and address of that party's representative. Any legal or contractual notices required to be sent to either party shall be deemed duly sent when mailed to the intended party's designated representative.

19. **WAIVER.** No term of this Contract may be waived except in writing signed by the parties.

Niagara Mohawk Power Corporation
T&Cs for the Supply of Goods, Installation
And Maintenance Services

Confidential and Proprietary
Rev. 5/12/99

20. **APPROVALS.**  It is understood that Niagara Mohawk may be required to obtain corporate, regulatory, and other third-party approvals and releases in connection with the provision of the Goods and/or Services.  If so, this Contract shall be effective subject to any such approvals and releases.

21. **LAWS.**  This Contract shall be interpreted and enforced according to the laws of the State of New York, and not those laws determined by application of New York's choice of law principles.  Venue in any action shall be in the State of New York.  Licensee agrees to submit to the personal jurisdiction of courts in the State of New York.

22. **SEVERABILITY.**  To the extent that any provision of this Contract shall be held to be invalid, illegal or unenforceable, it shall be severed from this Contract without affecting the validity, legality or enforceability of the remaining provisions of the Contract.

23. **INTEGRATION AND MERGER.**  Licensee and Niagara Mohawk agree that there are no understandings, agreements, or representations, expressed or implied, other than those expressed herein.  This Contract supersedes and merges all prior discussions and understandings, and constitutes the entire agreement between the parties.

**IN WITNESS WHEREOF,** the parties hereto agree to the terms and conditions of this Contract, and agree to be bound by the same, and represent that their signatories have complete authority to sign and accept this Contract.

**DOMINION TELECOM, INC.**

By: _____
    CHARLES VASSALLO
    Vice President-Strategy,
Title: Finance & Support Services

Date: March 19, 2002


**NIAGARA MOHAWK POWER CORPORATION**

By: _____
    CLEMENT E. NADEAU
Title: SR. VICE PRESIDENT - OPERATIONS

Date: 3/22/02

Niagara Mohawk Power Corporation
T&Cs for the Supply of Goods, Installation
And Maintenance Services

Confidential and Proprietary
Rev. 5/12/99

# EXHIBIT B

**WINDSTREAM COMMUNICATIONS, INC.**

731 N. Jackson Street
Suite 410
Milwaukee, WI 53202

Dick Hammetter
*Director- Outside Plant Network*

414.831.5112
Email: Richard.Hammetter@windstream.com



December 23, 2011

**VIA EMAIL**
**and US MAIL**

National Grid
Attn:  Christopher K. Denny, Lead Project Manager
300 Erie Boulevard West
Syracuse, NY 13202-4250
Chris.denny@us.ngrid.com

     Re:     National Grid- Lockport-Mortimer#111 Rebuild

Dear Mr. Denny:

     National Grid intends to conduct tower line replacement for a span of approximately 57 miles, from the Lockport Substation New York, to the Mortimer Substation New York.  It is estimated that construction will take place commencing on January 3, 2012 through 2014. National Grid has notified Intellifiber Networks, Inc., now a Windstream company ("Intellifiber"), that it will be crossing over Intellifiber lines located in the right of way on the LM#111 line while conducting such construction activities.

     Based on prior discussions with National Grid, Intellifiber requires that the following criteria be observed when National Grid is working near, or crossing over, Intellifiber fiber:

- Anywhere Intellifiber cable is to be "crossed" with heavy trucks/equipment, National Grid shall utilize appropriate ground protection (ie. matting, plates, etc.)
- National Grid agrees to protect the Intellifiber line, up to a 24" clearance zone; fiber outside of this zone will not require extra protection
- Anywhere Intellifiber cannot locate its cable, the site it will be Vac-Trucked for positive ID at National Grid's (or its contractor's) expense
- All appropriate "Dig Safe" tickets will be called in, per the New York State Dig Safe laws
- If any relocation of Intellifiber fiber is required, all costs associated with such relocation (including all contractor labor, hardware and supplies) shall be paid for by National Grid
- National Grid and its contractor's shall be held liable for any damage to the Intellifiber  cable or interruption of services caused by National Grid (or its contractor's) activities.

December 23, 2011
Page 2

We require that these standards are observed in order to safeguard Intellifiber facilities. Please evidence your agreement by signing below and returning a copy to my attention prior to the commencement of work.

If you have any questions, please feel free to contact me.

Sincerely,

Dick Hammetter
Windstream
Director, Outside Plant Network

**Agreed to and Accepted:**
**National Grid**

By:_____
        Christopher K. Denny, Lead Project Manager

# EXHIBIT C

# national**grid**

March 9, 2012

## *VIA EMAIL and US MAIL*

Windstream Communications, Inc.
731 N. Jackson Street
Suite 410
Milwaukee, WI  53202
Attn:   Dick Hammetter
           Director- Outside Plant Network

Re:      National Grid - Lockport-Mortimer #111 Rebuild Project

Dear Mr. Hammetter:

Thank you for your letter of December 23, 2011. Chris Denny, who has since left National Grid, forwarded it to me.  National Grid appreciates the cooperation that Intellifiber is providing in marking out your fiber optic cable ahead of the crews working on our Lockport-Mortimer #111 Rebuild Project.  In a similar spirit of cooperation, National Grid also requests Intellifiber's assistance in helping us to determine what specific protections, in addition to those measures we already plan to utilize, are required in order to ensure the safety of your cable.

With respect to the remainder of the project after the first segment now underway, National Grid and its contractors intend to employ limited ground protective measures (such as protective matting) at select locations.  These measures will comply with the Environmental Management and Construction Plan (EM&CP) that the New York Public Service Commission (PSC) has approved for this project.  National Grid requests your review and input in determining what protections and locations, if any, are required to protect your fiber optic cable above and beyond the protections and locations we have determined for compliance with the EM&CP.  To enable you to determine this, you can examine the EM&CP on the PSC's website[1] and we will be happy to detail for you and your team all of the protection measures and locations we have decided on for EM&CP compliance.  We will look to you to advise us what additional protections and locations you consider necessary or appropriate to protect your cable.

I should note that National Grid cannot waive its contractual right to require Intellifiber to reimburse National Grid for the costs it incurs for the incremental protective measures in excess of those we have determined we will employ to comply with the EM&CP.  We cannot waive or diminish any of the rights or benefits afforded to National Grid and its ratepayers by the Right of

---

[1] The EM&CP is available on the PSC's website at
http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterSeq=33023 under its filing date of October 24, 2011.

300 Erie Boulevard West, Syracuse, NY 13202
T: (315) 428-5836  ◾  C: (315) 350-1578

Occupancy Agreement between National Grid and your company.  These include National Grid's right to repair, upgrade, replace and reinstall the transmission line.  It is for this reason that National Grid is unable to countersign your December 23 letter.

For the same reason, we are unable to accept responsibility for the costs and risks listed in your December 23 letter that the agreement does not impose on National Grid.  For example, the letter asks National Grid to obligate itself to: (a) utilize appropriate ground protection anywhere Intellifiber cable is to be crossed with heavy trucks or equipment; (b) protect the cable up to a 24" clearance zone; (c) Vac-Truck (at our expense) for positive cable ID anywhere Intellifiber cannot locate the cable; (d) bear the cost of all required cable relocation; and (e) bear liability for any damage to the Intellifiber cable or interruption of services we cause.  The agreement is clear in its allocation to Intellifiber, rather than National Grid, of most of the responsibilities the letter seeks to impose upon us.[2]

All that being said, National Grid appreciates Intellifiber's cooperation and is ready and willing to continue our mutual efforts to perform this project with the least burden to all concerned, including an emphasis on cost-effective protective measures for important infrastructure.  I thank you for your attention to this matter, and look forward to hearing from you in the very near future.

Very truly yours,

_____

Scott A. Green
Project Manager - Complex Project Management
Niagara Mohawk Power Corporation d/b/a National Grid


cc:    Joseph H. Snyder, Principal Engineer, National Grid
       Lisa M. Zafonte, Esq., Senior Counsel, National Grid

---

[2]  The agreement specifies minimum burial depths for the fiber optic cable and requires Intellifiber to mark the cable along its entire route. (Section 6(q).)  It requires Intellifiber, not National Grid, to bear the cost of repairing, restoring or replacing the fiber optic cable if it is damaged or destroyed, with the only exception being if the damage "results from the willful misconduct or gross negligence" of National Grid. (Section 9(d).)  It obligates Intellifiber to pay all of National Grid's actual costs incurred under the agreement, including costs of work for Intellifiber's benefit. (Section 20(a).)

# EXHIBIT D

# national**grid**

April 9, 2012

***VIA EMAIL***

Windstream Communications, Inc.
731 N. Jackson Street
Suite 410
Milwaukee, WI 53202
Attn:
Phillip Hosack
Richard Hammeter
Michael Juskow

Re:    National Grid - Lockport-Mortimer #111 Rebuild Project

Dear Philip, Richard, & Mike,:

Enclosed is our contractor's cost estimate for project matting to protect the fiber optic cable owned by Windstream/Intellifiber that occupies the National Grid right-of-way where we are performing the Lockport-Mortimer #111 Rebuild Project.

This matting cost estimate totals approximately $6.9 million.  This includes the cost of matting already provided (approx. $1.47 million).  It also includes current and future matting (14,961 mats) priced at approximately $363 per mat.

This estimate covers only the matting that protects your fiber optic cable; it does not include any matting required for National Grid to comply with the Environmental Management and Construction Plan (EM&CP) that the New York Public Service Commission (PSC) has approved for this project.

We determined this amount of protection for your cable based on the protective requirements described in Intellifiber's letter of December 23, 2011, in particular, the statement that "Anywhere Intellifiber cable is to be 'crossed' with heavy trucks/equipment, National Grid shall utilize appropriate ground protection (ie. matting, plates, etc.)."  We have received no other direction from Intellifiber on which to guide our decisions on the amount of matting needed to protect your cable, so unless we are informed otherwise, we will deploy protections as detailed in that letter.  If you believe that a lesser level of protection would be appropriate, we request that you discuss that with us as soon as possible.

Finally, I reiterate a point I made in my March 9, 2012 letter.  In a number of respects, your December 23 letter is inconsistent with the Right of Occupancy Agreement between National

Grid and Intellifiber (copy enclosed).  Footnote 2 of my March 9 letter lists a number of examples.  One is that Intellifiber is required to pay all of National Grid's actual costs incurred under the Agreement, including costs of work for Intellifiber's benefit.  Based on the Agreement, National Grid will require Intellifiber to reimburse all of National Grid's costs incurred to protect Intellifiber's fiber optic cable.

I thank you for your attention to this matter, and look forward to hearing from you in the very near future.

Very truly yours,

_____

Scott A. Green
Project Manager - Complex Project Management
Niagara Mohawk Power Corporation d/b/a National Grid

cc:     Joseph H. Snyder, Principal Engineer, National Grid
        Lisa M. Zafonte, Esq., Senior Counsel, National Grid

# EXHIBIT E

# national**grid**

## INVOICE

National Grid
Miscellaneous Billing Department
300 Erie Blvd. West
Syracuse NY 13202
(315) 428-3110

| | |
|---|---|
| Page: | 1 |
| Invoice No: | 00036-084435 |
| Invoice Date: | 05/04/2012 |
| Customer Number: | 100168632 |
| Payment Terms: | Net 30 |
| Due Date: | 06/03/2012 |
| Sales Order #: | |
| Cust. PO#/Ref.: | WR # 2477511 / C03417 |

WINDSTREAM ACCOUNTS PAYABLE
P O BOX 18313
LITTLE ROCK AR 72222

| Line | Description | Quantity | UOM | Unit Amt | Net Amount: |
|---|---|---|---|---|---|
| | This invoice is for actual charges associated with fiber matting protector costs for January 2012 and February 2012 on the Lockport to Mortimer 111 project. | | | | |
| 1 | Fiber Matting Protection | 1.00 | QT | 1,927,179.69 | 1,927,179.69 |
| | We appreciate the opportunity to do business with you. If you have any questions about this invoice, please call Scott Green, Project Manager @ (315) 428-5836.. | | | | |

|  | | |
|---|---|---|
| **SUBTOTAL:** | | 1,927,179.69 |

| | |
|---|---|
| **TOTAL AMOUNT DUE :** | 1,927,179.69 |

You can pay these charges with a Credit Card-Debit Card-ACH for a fee through Western Union Speedpay web site
**https://paynow7.speedpay.com/nationalgrid/index.asp.**

Finance charges will accrue if payment is not received by the indicated due date.

PLEASE DETACH AND RETURN THIS STUB IN THE ENVELOPE PROVIDED

Make checks payable to National Grid

| | |
|---|---|
| Invoice No: | 00036-084435 |
| Invoice Date: | 05/04/2012 |
| Customer Number: | 100168632 |
| Due Date: | 06/03/2012 |

Mail Payment To:

| | | |
|---|---|---|
| National Grid | AMOUNT DUE: | 1,927,179.69 |
| Post Office - Brooklyn | | |
| P.O. Box 29794 | | |
| New York NY 10087-9794 | Enclosed: | |

STD-FORM

Original

# EXHIBIT F

| | |
|---|---|
| **From:** | Juskow, Michael <Michael.Juskow@windstream.com> |
| **Sent:** | Wednesday, May 09, 2012 8:50 AM |
| **To:** | Green, Scott A. |
| **Cc:** | Chuang, John; Morris, Leon; Zafonte Maffei, Lisa; Hosack, Phillip E.; Hammetter, Richard |
| **Subject:** | FW: Lockport Mortimer 111....Windstream Invoice |
| **Attachments:** | SKMBT_C65212050714530.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Please send any/all correspondence to John Chuang. He is with our Legal department and is active on this matter.

Thank You,
Mike

---

**From:** Green, Scott A. [mailto:Scott.Green@nationalgrid.com]
**Sent:** Tuesday, May 08, 2012 5:16 PM
**To:** Juskow, Michael; Hosack, Phillip E.; richard.hammetter@windstream.com
**Cc:** Zafonte Maffei, Lisa
**Subject:** RE: Lockport Mortimer 111....Windstream Invoice

Mike, Phillip, and Richard,

I have sent out the first invoice for protective fiber matting costs on the Lockport Mortimer 111 Project to the address you provided. Attached is an electronic copy of the letter and invoice.

Please contact me with any questions.


Thank You,

Scott Green
Project Manager
Complex Project Mgmt
National Grid
300 Erie Blvd W
Syracuse, NY 13202
Office (315) 428-5836
Cell (315) 350-1578
scott.green@us.ngrid.com


************************************************************************
This e-mail and any files transmitted with it, are confidential to National Grid and are intended solely for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please reply to this message and let the sender know.

This email has been scanned by the Symantec Email Security.cloud service.

# EXHIBIT G

-----Original Message-----
From: Morris, Leon [mailto:Leon.Morris@windstream.com]
Sent: Wednesday, June 27, 2012 11:56 PM
To: Green, Scott A.
Subject: Windstream Invoice Dispute

Scott,

    Attached you will find a formal letter of dispute for the invoice recently submitted to Windstream (you should receive the signed copy on Friday 6/29). For the time being, I'll be taking this issue over from Mike Juskow and ask that you route any communications or questions on this matter through my office.

    Thanks,
        Leon Morris
        Area Manager, East 2 - Windstream
        Cell: 404.557.8147

--------------------------------------------------------------------

The information contained in this message, including attachments, may contain privileged or confidential information that is intended to be delivered only to the person identified above. If you are not the intended recipient, or the person responsible for delivering this message to the intended recipient, Windstream requests that you immediately notify the sender and asks that you do not read the message or its attachments, and that you delete them without copying or sending them to anyone else.

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This e-mail, and any attachments are strictly confidential and intended for the addressee(s) only. The content may also contain legal, professional or other privileged information. If you are not the intended recipient, please notify the sender immediately and then delete the e-mail and any attachments. You should not disclose, copy or take any action in reliance on this transmission.

You may report the matter by contacting us via our UK Contacts Page<http://www2.nationalgrid.com/contact-us/> or our US Contacts Page<https://www1.nationalgridus.com/ContactUs> (accessed by clicking on the appropriate link)

Please ensure you have adequate virus protection before you open or detach any documents from this transmission. National Grid plc and its affiliates do not accept any liability for viruses. An e-mail reply to this address may be subject to monitoring for operational reasons or lawful business practices.

For the registered information on the UK operating companies within the National Grid group please use the attached link: http://www.nationalgrid.com/corporate/legal/registeredoffices.htm

# EXHIBIT H

*Via Overnight Mail*

6/27/2012

Scott A. Green
Niagara Mohawk Power Corporation d/b/a National Grid
300 Erie Boulevard West
Syracuse, NY 13202

Niagara Mohawk Power Corporation d/b/a National Grid
Attn: Manager – Telecommunications Opportunities
300 Erie Boulevard West
Syracuse, NY 13202

Niagara Mohawk Power Corporation
Attn: Law Dept.
300 Erie Boulevard West
Syracuse, NY 13202

**Re: National Grid – Lockport – Mortimer #111 Rebuild Project**

Dear Mr. Green:

We are in receipt of your letter dated May 7, 2012 and the invoice in the amount of $1,927,179.69 for matting related to National Grid's tower line replacement project from the Lockport Substation to the Mortimer Substation. Windstream believes it is National Grid's responsibility for the costs of any and all protective measures for a project that is for the specific and sole benefit of National Grid.  Accordingly, please accept this letter as a formal dispute of the charges contained in the invoice.

National Grid is required by New York State Code Part 753 to provide adequate support and protection for underground facilities in order to assure public safety and to prevent damage to public and private property.

753-3.12 Required support and protection for underground facilities.

a.    An excavator shall provide prompt and adequate support and protection for every underground facility located in the work area as is reasonably specified by the operator of any such facility.

b.    In the absence of any specifications by the operator, the excavator shall provide support and protection in accordance with generally accepted engineering practice, including but not limited to shoring and bracing.

    c.    Support shall be at least equivalent to the previously existing support and shall protect the underground facility against freezing and against traffic and other loads.

    d.    Support shall be maintained during excavation, during backfilling and, if necessary, after backfilling is completed.

    e.    The operator may, in agreement with the excavator, provide such support.

National Grid has an obligation under law and pursuant to the Right of Occupancy Agreement ("Agreement") to provide adequate support and protection as reasonably specified by Windstream and thus, National Grid is the party responsible for protective measures when performing work in the ROW. This project was initiated by and for the exclusive and sole benefit of National Grid. Accordingly, Windstream disagrees with the characterization in Footnote 2 of your March 9, 2012 letter that the work is for the benefit of Windstream. This project is neither related nor attributable to any ordinary maintenance costs for the sole benefit of Windstream. Moreover, there was never any agreement by representatives of Windstream or Intellifiber to bear the cost of labor or materials related to this project. To the contrary, in a meeting with Christopher Denny who was the lead project manager for National Grid at the time, Windstream came away with the understanding that National Grid will bear the cost to protect Windstream's facilities.

Windstream believes Section 9 of the Agreement provides guidance on which party bears the expense when a project is for the sole benefit of one of the parties. Specifically, it provides where relocation is for National Grid's benefit, National Grid is responsible for the related costs.

Thank you for your attention to this matter. Please feel free to contact me if you have any questions or if you wish to schedule a meeting to discuss this matter further.

Sincerely,

Leon Morris
Area Manager – CLEC Operations

# EXHIBIT I

# national**grid**

**INVOICE**

National Grid
Non-Utility Billing
300 Erie Blvd. West
Syracuse NY 13202
(315) 428-3110

| | |
|---|---|
| Page: | 1 |
| Invoice No: | 00036-084435R |
| Invoice Date: | 5/4/2012 |
| Customer No: | 200000002 |
| Payment Terms: | Net 30 |
| Due Date: | 6/3/2012 |
| Sales Order #: | 5210/600025640 |
| Reference #: | WR#2477511/C03417 |

WINDSTREAM COMMUNICATIONS INC.
ATT: BRENDA WILFONG C00010461
PO Box 18313
Little Rock AR 72222-8313

| Line | Description | Quantity UOM | Unit Amount | Net Amount |
|---|---|---|---|---|

This invoice is a revision to invoice 00036-084435, dated 5/4/2012 for actual charges associated with fiber matting protector costs for January 2012 and February 2012 on the Lockport to Mortimer 111 project.

If you have any questions about this invoice, please contact SCOTT GREEN at (315) 350-1578

Direct cost = $1,467,214.00
10%= 146,721.40
Sales tax= 71,483.00

TOTAL AMOUNT DUE:                                              $ 1,685,418.40

---

PLEASE DETACH AND RETURN THIS STUB IN THE ENVELOPE PROVIDED

Make checks payable to National Grid

Mail Payment to:

| | |
|---|---|
| Invoice No: | 00036-084435R |
| Invoice Date: | 5/4/2012 |
| Customer No: | 200000002 |
| Due Date: | 6/3/2012 |

National Grid
P.O. Box 29794
New York, NY 10087-9794

AMOUNT DUE: $ 1,685,418.40
Enclosed:_____

# national**grid**

**INVOICE**

National Grid
Non-Utility Billing
300 Erie Blvd. West
Syracuse NY 13202
(315) 428-3110

| | |
|---|---|
| Page: | 2 |
| Invoice No: | 00036-084435R |
| Invoice Date: | 5/4/2012 |
| Customer No: | 200000002 |
| Payment Terms: | Net 30 |
| Due Date: | 6/3/2012 |
| Sales Order #: | 5210/600025640 |
| Reference #: | 0800045728 |

WINDSTREAM COMMUNICATIONS INC.
ATT: BRENDA WILFONG C00010461
PO Box 18313
Little Rock AR 72222-8313

Prices are subject to change after 90 days

Please be sure to remit your payment to the address provided on the remittance stub. Do not send payments to the company representative who quoted you the value for the work to be performed.

For payments up to $5000, you can pay these charges with a Credit Card – Debit Card – ACH for a fee through Western Union Speedpay web site https://paynow7. Speedpay.com/nationalgrid/index.asp

FILED: ONONDAGA COUNTY CLERK 11/06/2015 02:11 PM
NYSCEF DOC. NO. 111    Case 5:16-cv-00035-DNH-TWD    Document 1-1    Filed 01/11/16    Page 92 of 94

INDEX NO. 2015EF4568

RECEIVED NYSCEF: 11/06/2015

# EXHIBIT J

# national**grid**

**INVOICE**

National Grid
Non-Utility Billing
300 Erie Blvd. West
Syracuse NY 13202
(315) 428-3110

|                |              |
|----------------|--------------|
| Page:          | 1            |
| Invoice No:    | 800045728    |
| Invoice Date:  | 01/28/2014   |

WINDSTREAM COMMUNICATIONS INC.
ATT: BRENDA WILFONG C00010461
PO Box 18313
Little Rock AR 72222-8313

|                  |                 |
|------------------|-----------------|
| Customer No:     | 200000002       |
| Payment Terms:   | Net 30          |
| Due Date:        | 02/27/2014      |
| Sales Order #:   | 5210/600025640  |
| Reference #:     | 0800045728      |

| Line | Description | Quantity UOM | Unit Amount | Net Amount |
|------|-------------|--------------|-------------|------------|

Actual fiber matting protection costs for April 2012 – November 2012 to protect the fiber optic cable owned by Windstream/Intellifiber as part of the Lockport-Mortimer 111 project.

If you have any questions about this invoice, please contact SCOTT GREEN at (315) 350-1578

LM-111 Fiber Optic Cable Matting Protection
Direct cost= $6,725,521.44
10%= 672,552.14
Sales tax= 327,667.44

TOTAL AMOUNT DUE:                                              $7,725,741.02

---

PLEASE DETACH AND RETURN THIS STUB IN THE ENVELOPE PROVIDED

Make checks payable to National Grid

Mail Payment to:

|                |              |
|----------------|--------------|
| Invoice No:    | 800045728    |
| Invoice Date:  | 01/28/2014   |
| Customer No:   | 200000002    |
| Due Date:      | 02/27/2014   |

National Grid
P.O. Box 29794
New York, NY 10087-9794

AMOUNT DUE: $7,725,741.02
Enclosed:_____

# national**grid**

**INVOICE**

National Grid
Non-Utility Billing
300 Erie Blvd. West
Syracuse NY 13202
(315) 428-3110

| | |
|---|---|
| Page: | 1 |
| Invoice No: | 800045728 |
| Invoice Date: | 01/23/2014 |
| Customer No: | 200000002 |
| Payment Terms: | Net 30 |
| Due Date: | 02/27/2014 |
| Sales Order #: | 5210/600025640 |
| Reference #: | 0800045728 |

WINDSTREAM COMMUNICATIONS INC.
ATT: BRENDA WILFONG C00010461
PO Box 18313
Little Rock AR 72222-8313

Prices are subject to change after 90 days

Please be sure to remit your payment to the address provided on the remittance stub. Do not send payments to the company representative who quoted you the value for the work to be performed.

For payments up to $5000, you can pay these charges with a Credit Card – Debit Card – ACH for a fee through Western Union Speedpay web site https://paynow7. Speedpay.com/nationalgrid/index.asp